**FORD MOTOR COMPANY, Jaguar Cars Limited and Aston Martin Limited, Plaintiffs,**

v.

**LLOYD DESIGN CORP, Defendant.**

No. 00–72734.

United States District Court, E.D. Michigan, Southern Division.

Feb. 1, 2002.

Kathleen A. Lang, Dickinson, Wright, Detroit, MI, Gregory D. Phillips, Thomas R. Lee, and Scott R. Ryther, Phillips & Andersen, Salt Lake City, UT, Daniel M. Stock, Donald B. Aiken and Susan N. McFee, Ford Motor Company, for Plaintiffs.

Joseph C. Basta, Benjamin W. Jeffers, Dykema Gossett, Detroit, MI, Bruce A. Truex, Secrest, Wardle, Farmington Hills, MI, Eliot G. Disner, Ervin, Cohen, Beverly Hills, CA, for Defendant.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*ROBERTS, District Judge.

### I. *Introduction*

The instant trademark case is brought by Plaintiffs Ford Motor Company, Jaguar Cars Limited, and Aston Martin Lagonda Limited against Defendant Lloyd Design Corp., a manufacturer of automobile floor mats. It is undisputed that Defendant markets and sells mats bearing some of Plaintiffs' registered trademarks. Defendant markets his mats without having obtained licenses from Plaintiffs and despite the fact that Plaintiffs also market floor mats bearing their trademarks. Plaintiffs' August 30, 2001 Verified Amended Complaint alleges that Defendant has engaged in trademark infringement, trademark dilution and false designation in violation of 15 U.S.C. §§ 1114, 1125 and the common law.

Plaintiffs filed a Motion for Preliminary Injunction contemporaneously with filing their Complaint. The Honorable Bernard Friedman denied the Motion on August 29, 2000. Plaintiffs appealed. In the interim, the case was transferred to this Court, which granted Plaintiffs' Motion for Injunction Pending Appeal on December 7, 2000 and granted Plaintiffs' Motion to Dismiss Defendant's Counterclaims on December 14, 2000. Then, on October 25, 2001, the Sixth Circuit vacated and remanded the denial of Plaintiffs' Motion for Preliminary Injunction.

The following week, on October 31, 2001, Plaintiffs' filed their Motion for Summary Judgment. Defendant's Motion for Summary Judgment or in the Alternative Partial Summary Judgment was filed on December 17, 2001. These are the matters presently before the Court.

After consideration of the parties' briefings and evidentiary material, the Court will grant Plaintiffs' Motion and will deny Defendant's Motion except as it relates to Plaintiffs' false advertising claim. Additionally, as a result of Defendant's flagrant disregard for Plaintiffs' trademark rights, the Court will award Plaintiffs' attorneys fees.

### II. *Background*

Collectively, Plaintiffs' own numerous trademarks, including but not limited to Ford®, Bronco®, Excursion®, Expedition®, Navigator®, Explorer®, Mustang®, Lincoln®, Mercury®, Mustang®, Ranger®, Mountaineer®, Taurus®, Windstar®, the Ford Thunderbird Logo®, F–150®, F–250®, F–350®, Jaguar® and Aston Martin®.[1] In Answer to Plaintiff's Amended Complaint, Defendant "admits that it did prominently display ... on its mats, most of the claimed trademarks Plaintiffs' list" until the injunction pending appeal was entered. (Answer at ¶ 10).

---

1. See Plaintiffs' Representative Samples of Plaintiffs' Trademark Registrations for Classes 12 and 27, filed under separate cover and denoted document 139.

Indeed, in answer to an interrogatory, Defendant acknowledged having used numerous of Plaintiffs' trademarks, including all of the previously cited trademarks except Mercury® in connection with its sales. (*Plt's Br.*, Ex. 17). And, in deposition, Defendant's president, Lloyd Levine, admitted that the company collected brochures regarding Plaintiffs' vehicles from dealerships in order to scan and reproduce images of vehicle model names. He acquired other images of Plaintiffs' trademarks from the Internet. Levine testified that the lettering used on his mats is "sometimes" the same as that used by Plaintiffs. (*Plt's Br.*, Ex. 1 at 150–159).[2] A comparison of the styling used by Plaintiffs for the Navigator®, Expedition®, Explorer® and Windstar® marks and that used on Defendant's mats confirms that Defendant has engaged in exact copying of Plaintiffs' trademarks. (*See Plt's Reply*, Exs. 19 & 20, and *Plt's Br.*, Ex. 7).

Defendant further "admits that it is not a licensee or franchisee of Plaintiffs." (Answer at ¶ 15).[3] Defendant acknowledged its lack of authorization on the boxes it used to ship its mats: "These mats are a product of LLOYD DESIGN CORP. No affiliation with or approval of any automobile manufacturer is intended or implied." A label on the box and a removable card attached to the mats repeat that disclaimer. Additionally, a label sown into the backing of the mats reads, "These mats are solely a product of Lloyd Design Corp. and are not manufactured under li-

cense or authorization from any automobile manufacturer." (*Plt's Br.*, Ex. 13). According to Defendant, when customers purchased its mats through independent dealerships, the disclaimers were observable on the mats held in inventory, the color swatches used for ordering or on customer information sheets. (*Deft's Resp.*, Ex. 1–3).

Notwithstanding, a significant portion of Defendant's sales is achieved through automobile accessory catalogs, such as *Performance Products* and *Stylin' Concepts*, which primarily receive orders by way of telephone. The customers placing the telephone orders of Defendant's mats did not see the disclaimers when their purchases were made and were not otherwise advised that the mats bearing Plaintiffs' trademarks were not manufactured by an authorized licensee of Plaintiffs. (Plt's Br., Ex. 1 at 95–100, Ex. 4 at 118–124, Ex. 5 at 63–68 & Exs. 11–12).[4]

### III. *Analysis*

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir.1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact

---

**2.** During Levine's deposition, Plaintiffs' attorney marked as Exhibit 1006 a number of pages that Defendant produced in discovery that includes reproductions of Plaintiffs' trademarks. Exhibit 1006 to Levine's deposition is attached as Exhibit 7 to Plaintiffs' brief in support of its Motion for Summary Judgment.

**3.** Defendant's applications to Ford in April of 1995 and May of 1998 to become a licensee were both denied. (*Plt's Br.*, Ex. 15).

**4.** Indeed, a *Stylin' Concepts* catalog described Defendant's Mats as being "Ford approved." (*Plt's Br.*, Ex. 12). However, the owner of the catalog, John Milos, explained that that representation was the result of a computer and proofreading error on the part of the catalog company. (*Milos Declaration* at ¶¶ 3–4).

would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir.1995).

Plaintiffs allege that Defendant's use of their trademarks constitutes trademark infringement in violation of 15 U.S.C. § 1114,[5] unfair competition (i.e., false designation of origin) and false advertising in violation of 15 U.S.C. § 1125(a) and dilution in violation of 15 U.S.C. § 1125(c). The Court will address these claims and the asserted defenses below.

## A. *Trademark Infringement and Unfair Competition*

■ Plaintiffs' trademark infringement claim is brought pursuant to 15 U.S.C. § 1114. In *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir.1997), the court observed, "The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." The court further instructed that a court determining whether a likelihood of confusion exists must attempt to thoroughly examine eight factors:

1. strength of the senior mark;
2. relatedness of the goods or services;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. the intent of defendant in selecting the mark; and
8. likelihood of expansion of the product lines.

*Id.* However, the court also emphasized that these factors are a guide and that they need not be analyzed with mathematical precision. *Id.* Similarly, the court in *Esercizio v. Roberts*, 944 F.2d 1235, 1242 (6th Cir.1991), stated, "A party claiming infringement need not show all, or even most, of these factors in order to prevail."

Plaintiffs also allege unfair competition as defined by 15 U.S.C. § 1125(a). "[L]ikelihood of confusion is the essence of an unfair competition claim and [ ] the same factors are considered under section 1125(a) as are considered under section 1114." *Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 604 (6th Cir. 1991).

The Court will first consider the eight factors relevant to Plaintiffs' trademark infringement and unfair competition claims, and will then address Defendant's arguments that Plaintiffs' trademarks are functional and that its disclaimers eliminate any likelihood of confusion.

### 1. *Strength of Plaintiffs' Marks*

"When assessing its strength, a court will place a trademark into one of four categories: generic, descriptive, suggestive, and fanciful or arbitrary." *Daddy's Junky Music Stores* at 280. Fanciful and arbitrary trademarks enjoy the strongest

---

**5.** Plaintiffs also alleged trademark infringement under the common law, but did not provide the Court with much guidance on the common law version. Since the Court will grant Plaintiffs the injunctive relief they re-quest due to Defendant's violations of §§ 1114 and 1125(a) and (c), analysis of Plaintiffs' common law trademark infringement claim does not appear to be a fruitful exercise.

protection. *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1117 (6th Cir.1996).

'An "arbitrary" mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached,' such as CAMEL cigarettes or APPLE computers. [*Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.,* 834 F.2d 568, 571 (6th Cir.1987) ], 'A "fanciful" mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned,' such as EXXON or KODAK. *Id.*

*Id.*

Plaintiffs' trademarks are either arbitrary or fanciful. Ford®, Jaguar®, Aston Martin®, Lincoln®, Mercury®, Mustang®, Bronco®, Taurus®, Windstar®, Excursion®, Expedition®, Navigator®, Moutaineer®, and Thunderbird® are names that are unrelated in everyday life to automobiles. It is Plaintiffs' use of those names on its vehicles and related articles that has given the names secondary meaning. Thus, those marks are arbitrary. The marks F–150®, F–250® and F–350® signify nothing other than the vehicles bearing those names and, therefore, those marks are fanciful.

Furthermore, Defendant's intentional copying of Plaintiffs' trademarks is strong evidence of their secondary meaning. Borrowing from *Esercizio,* "The evidence of intentional copying shows the strong secondary meaning of the [Plaintiffs' trademarks] because '[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.'" *Esercizio* at 1239, (quoting *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.,* 283 F.2d 551, 558 (9th Cir.1960)).

Hence, the strength of Plaintiffs' trademarks favors their claim that Defendant's use of those marks on its floor mats creates a likelihood of confusion.

### 2. *Relatedness of The Goods*

Plaintiffs and Defendant both use trademarks belonging to Plaintiffs on automobile floor mats. Defendant argues that Plaintiffs have not demonstrated exactly which of its trademarks they use on floor mats, but it is beyond dispute that Plaintiffs use their trademarks in relation to vehicles and related accessories. This factor weighs in Plaintiffs' favor.

### 3. *Similarity of the Marks*

Defendant admits that it "sometimes" uses exact reproductions of Plaintiffs' marks on its floor mats. Nonetheless, Defendant argues that Plaintiffs have provided no side-by-side comparison of its and Plaintiffs' mats. In actuality, Plaintiffs did provide brochures and catalogs that allowed this Court to compare the styling used by Plaintiffs for the Navigator®, Expedition®, Explorer® and Windstar® marks with that used by Defendants. That comparison confirms that Defendant has engaged in exact copying of Plaintiffs' trademarks.

Moreover, even if the styling Defendant uses is not always an exact replica of Plaintiffs' when compared side-by-side, that is not the standard.

[I]n evaluating similarity of marks, " '[i]t is axiomatic in trademark law that 'side-by-side' comparison is not the test.'" [*Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1187 (6th Cir.1988) ] (quoting *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 822 (9th Cir.1980)). Instead, the marks must be viewed in their entirety and in context. "[A] court must determine, in the light of what occurs in the marketplace, whether the mark 'will be confusing to the public when singly presented.'" *Id.* at 1187 (quoting *Beer*

*Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 941 (10th Cir.1983)). It is the overall impression of the mark, not an individual feature, that counts. *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1109 (6th Cir.1991).

Viewed in their entirety and in context, there is no genuine dispute that Defendant uses marks that are confusingly similar to Plaintiffs' trademarks. Regardless of whether the styling is the same or different than that Plaintiffs' use, the words used on Defendant's mats are identical to those comprising Plaintiffs' trademarks. Defendant puts Plaintiffs' trademarked words on its mats because the mats are specifically intended to serve as harmonious accessories [6] to vehicles manufactured by Plaintiffs. If Defendant's mats "create[d] substantially different commercial impressions," *Id.,* they would not so easily harmonize with Plaintiffs' vehicles.

In short, the similarities of the marks favors a finding of likelihood of confusion.

#### 4. *Evidence of Actual Confusion*

Plaintiffs have offered no evidence of actual confusion. The Court agrees with Defendant that, contrary to Plaintiffs' argument otherwise, the evidence shows that *Stylin' Concepts'* erroneous representation that Defendant's mats were "Ford approved" was a proofreading error rather than a result of actual confusion.

Nonetheless, Defendant's contention that the lack of evidence regarding actual confusion is strong proof of no likelihood of confusion is without merit. Although proof of actual confusion will strengthen a plaintiff's case, "a successful Lanham Act plaintiff only must show a sufficient potential of confusion, not actual confusion."

*Daddy's Junky Music Stores* at 284. "Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant." *Id.* In agreement, the court in *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1188 (6th Cir.1988)(quoting *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 914 (Fed.Cir.1984)), discounted the lack of evidence of actual confusion:

> The District Court found 'no known or demonstrated instances of actual confusion by the individual consumer or the industrial market.' Joint Appendix at 29. While we accept this finding of fact, we disagree with the significance that the District Court placed on the absence of this factor. Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion. Yet, it does not follow that lack of evidence of actual confusion should be a significant factor, as the District Court assumes. In a case where there was no evidence of actual confusion, the Court of Appeals for the Federal Circuit correctly reasoned that 'this fact does not preclude this Court from concluding that there is a "likelihood of confusion", as actual confusion is merely one factor to be considered by the Court when it makes its determination.'

In light of this authority, and in light of Plaintiffs' otherwise strong showing of a likelihood of confusion, the Court gives little weight to the lack of evidence of actual confusion.

#### 5. *Marketing Channels*

The marketing channels factor "consists of considerations of how and to whom the respective goods or services of the parties

---

6. As will be discussed *infra.,* Defendant relies heavily on *Plasticolor Molded Products v. Ford Motor Co.,* 713 F.Supp. 1329, 1339 (C.D.Cal. 1989). That opinion described mats bearing Plaintiffs' trademarks as contributing "to a harmonious ensemble of accessories and decorat[ing] the interior of a car." *Id.* at 1335.

are sold." *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1110 (6th Cir.1991).

In this case, Defendant admits to having marketed its mats via Plaintiffs' authorized dealerships. More importantly, Plaintiffs and Defendant target the same type of customers—retail purchasers of vehicles manufactured by Plaintiffs. Hence, this factor weighs in favor of a finding of likelihood of confusion.

### 6. *Likely Degree of Purchaser Care*

"In general, the less care that a purchaser is likely to take in comparing products, the greater the likelihood of confusion." *Wynn Oil Co. v. American Way Service Corp.,* 943 F.2d 595, 602 (6th Cir. 1991). A higher likelihood of care is expected when prospective purchasers have relevant expertise or sophistication, or when the goods are expensive or unusual. *Daddy's Junky Music Stores* at 285. "For example, home buyers will display a high degree of care when selecting their real estate brokers, whereas consumers of fastfood are unlikely to employ much care during their purchases." *Id.,* (citation omitted).

To show that purchasers exercise a higher degree of care when purchasing floor mats, Defendant offers the testimony of Charles Barr, who has sold floor mats for Dean Sellers Ford. But Barr's testimony is not helpful to Defendant. Barr testified that customers prefer mats that include the name of their car, but do not care whether a mat was made or authorized by Ford. Barr additionally opined that the Ford oval and the word "Explorer" relate to Ford Motor Company. (Barr Tr. at 55, 76, 109–110). So, Barr's testimony supports a finding that customers would not likely take efforts to compare or closely examine their floor mats, and would likely relate mats bearing Plaintiffs' trademarks to Plaintiffs.

Additionally, Defendant's floor mats are not expensive, ranging in price from about $100 or less, (*see Plt's Br.,* Exs. 9–12), and the average purchaser is not likely to have any particular expertise or sophistication regarding the product.

For these reasons, the Court finds that purchasers of Defendant's floor mats are unlikely to exercise a great deal of care.

### 7. *Defendant's Intent*

A likelihood of confusion is presumed when a trademark design is intentionally copied. *Esercizio* at 1243, (referring to the "presumption of likelihood of confusion that follows from intentional copying."). More recently, on Plaintiffs' appeal of the denial of their Motion for Preliminary Injunction, the Sixth Circuit again noted, "[A] likelihood of confusion is presumed when a defendant intentionally copies a trademark design 'with the intent to derive a benefit from the reputation of another.'" *Ford Motor Co. v. Lloyd Design Corp.,* 2001 WL 1356137, *4, 22 Fed.Appx. 464 (6th Cir.2001)(quoting *Esercizio* at 1243).

Generally speaking, direct evidence of an infringer's intent is not necessary. *Daddy's Junky Music Stores* at 286. "Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Id.* In this case, there is no need to rely upon such circumstantial evidence. Levine admitted in his deposition that Defendant copied Plaintiffs' trademarks from automobile brochures and from the Internet, and "sometimes" reproduced exact replicas onto its mats. Hence, in this case, there is direct evidence that Defendant intended to copy Plaintiffs' trademarks.

Defendant contends that it never intended to derive any benefit from Plaintiffs' reputation, but its argument at the hearing for Plaintiff's Motion for Summary Judgment belies that contention. At that Au-

gust 23, 2000 hearing, Defendant's counsel essentially acknowledged that Defendant has capitalized on the pride consumers have in their ownership of Plaintiffs' vehicles. (*Plt's Br.*, Ex. 6 at 25).[7] He described Plaintiffs' trademarks on Defendant's mats as being "the sizzle that sells the steak . . . ." (*Id.*). Further, in opposition to Plaintiffs' Motion for Summary Judgment, Defendant admits that customers are willing to pay a premium for floor mats that include Plaintiffs' trademarks. (*Dft's Opp.* at 11).

The language Defendant actually uses is: "[C]ustomers are willing to pay a premium for mats that provide the vehicle badging function . . . ." (*Id.*) Defendant apparently believes it to be incidental that the vehicle badges at issue just happen to be Plaintiffs' trademarks. Rather than being incidental, the fact that the vehicle badges are trademarks invokes Plaintiffs' with the right to exclude Defendant from using those badges on its mats to boost its sales and sale prices.

> To say one has a 'trademark' implies ownership and ownership implies the right to exclude others. If the law will not protect one's claim of right to exclude others from using an alleged trademark, then he does not own a 'trademark,' for that which all are free to use cannot be a trademark.

*McCarthy on Trademarks and Unfair Competition* § 2:14 (4th ed.2000).[8]

Since Defendant admitted to intentionally copying Plaintiffs' trademarks onto it mats, this factor alone is sufficient for the Court to find a likelihood of confusion.

### 8. *Likelihood of Expansion of the Product Lines*

"[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners Group* at 1112. Inasmuch as Plaintiffs and Defendant already compete in the floor mat business and market to the same consumers, this factor is not applicable here.

### 9. *Disclaimers and Aesthetic Functionality*

■ According to Defendant, despite the fact that its mats bear exact replicas of Plaintiffs' trademarks, consumers are unlikely to be confused because the packaging and backing of its floor mats prominently display its disclaimers. To sustain this argument, Defendant bears the "heavy burden" of demonstrating that its disclaimers significantly reduce the likelihood of consumer confusion. *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1316 (2nd Cir.1987).

Defendant's burden is heavy because; as many courts have observed, disclaimers are generally regarded as ineffective. *Home Box Office* at 1315, ("[T]here is a body of academic literature that questions the effectiveness of disclaimers in preventing consumer confusion as to the source of a product."); *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 619 (7th Cir. 1995)("[W]e make little of the disclaimer, which few consumers will read."). The principle that disclaimers are often ineffective is especially applicable when the infringer uses an exact replica of the rele-

---

7. Defendant's counsel stated, "[T]he product itself is designed to blend into the vehicle and create this pride . . . ." (*Plt's Br.*, Ex. 6 at 25).

8. Moreover, as will be discussed *infra.*, the Court rejects Defendant's arguments that Plaintiffs' trademarks are functional and that its disclaimers effectively eliminate any likelihood of confusion.

vant trademark. "Especially where the infringement in issue is a verbatim copying of the plaintiff's name, we are convinced that that plaintiff's reputation and goodwill should not be rendered forever dependent on the effectiveness of fineprint disclaimers often ignored by consumers." *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1093 (7th Cir.1988).

Defendant has not sustained its heavy burden. First and foremost, many of Defendant's customers do not even see its disclaimers when they are purchasing their mats. And, Defendant has produced no evidence that the disclaimers are effective when they are provided to consumers. Moreover, even if the disclaimers are effective with respect to the purchasers of the mats, they are insufficient because they do not reach consumers beyond the point of sale.

This case is akin to *Esercizio v. Roberts*, 944 F.2d 1235 (6th Cir.1991). In that case, the defendant built and sold replicas of Ferrari models. The defendant argued, *inter alia*, that his purchasers were well aware that they were not getting the genuine automobile. The court found that argument unavailing. "The Lanham Act, however, was intended to do more than protect consumers at the point of sale." *Id.* at 1244. Explaining its reasoning, the *Esercizio* court quoted with approval language from *Rolex Watch U.S.A., Inc. v. Canner*, 645 F.Supp. 484 (S.D.Fla.1986):

> Individuals examining the counterfeits, believing them to be genuine Rolex watches, might find themselves unimpressed with the quality of the item and consequently be inhibited from purchasing the real time piece. Others who see the watches bearing the Rolex trademarks on so many wrists might find themselves discouraged from acquiring a genuine because the items have become

too common place and no longer possess the prestige once associated with them. *Esercizio* at 1244–1245, (quoting *Rolex Watch* at 495).

Defendant further argues that Plaintiffs' trademarks serve a functional purpose on its floor mats. As explained in *Esercizio*,

> Trademark law does not protect the functional features of products because such protection would provide a perpetual monopoly of features which could not be patented. A product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.

*Esercizio* at 1246.

In arguing that its disclaimers are sufficient and that Plaintiffs' trademarks are functional, Defendant principally relies upon *Plasticolor Molded Products v. Ford Motor Co.*, 713 F.Supp. 1329, 1339 (C.D.Cal.1989), *vacated*, 767 F.Supp. 1036 (C.D.Cal.1991). Defendant describes *Plasticolor* as "the most relevant example of a court's acceptance of the use of disclaimers . . . ." (*Dft's Opp.* at 17). The fact that *Plasticolor* was vacated is the first indication that Defendant is operating on shaky ground. More importantly, as described below, the Sixth Circuit has rejected the aesthetic functionality doctrine as described in *Plasticolor*.

Factually, this case is a mirror image to *Plasticolor*. Like Defendant, Plasticolor manufactured and sold floor mats bearing Ford's trademarks and used packaging to disclaim any relationship between the mats and Ford Motor Company. As a result of the disclaimers, the *Plasticolor* court denied Ford's motion for summary judgment on its trademark infringement claim. The *Plasticolor* court acknowledged that placing disclaimers on the packaging and backing of floor mats could still cause confusion past the point of sale. *Id.* It, however,

reasoned that some confusion beyond the point of sale may be tolerated in order to protect the trademark's functional purpose. *Plasticolor* at 1339.

The *Plasticolor* court stated that a design is "aesthetically functional if it is desired for its appearance ...." *Plasticolor* at 1336, n. 11. Further, some marks that identify the source of a product may also be aesthetically functional. Ford's trademarks on the floor mats served such dual purposes:

> On one hand, a purchaser could reasonably interpret the marks as source-identifiers, as indicating that Ford has either manufactured or authorized production of the mats. On the other hand, a purchaser could reasonably consider the marks to be functional elements, designed to help the mats contribute to a harmonious ensemble of accessories and decorate the interior of a car. Indeed, a reasonable purchaser could easily interpret the marks both ways simultaneously.

*Id.* at 1335.

The *Plasticolor* court determined that, when it came to mixed-use symbols, such as Ford's trademarks, it must look "for a solution that permits trademarks to be copied as functional features, but minimizes the likelihood that the public will associate the copied mark with the registrant." *Plasticolor* at 1339. The court recognized that, while packaging, labeling and removable disclaimers could eliminate confusion at the point of sale, such disclaimers cannot effectively reach the public beyond that point. Consequently, the court found that some confusion regarding the source of products with mixed-use symbols must be tolerated.

> A floor mat whose upper surface reads 'FORD (not authorized by Ford Motor Company)' would obviously attract few customers. Protecting functional copying of trademarks will therefore require

that we tolerate at least some confusion as to source or sponsorship after the point of sale. The potential for confusion can be diminished, however, by requiring that the manufacturer of a product that employs a trademark for functional purposes take all reasonable steps to eliminate post-sale confusion consistent with the functional use of the mark.

*Plasticolor* at 1339.

In addition to the fact that *Plasticolor* was vacated, the Court finds Defendant's reliance upon that opinion unavailing because the Sixth Circuit has rejected the mixed-use analysis set forth in *Plasticolor*. "[T]he precedent in this circuit suggests that aesthetic functionality will not preclude a finding of nonfunctionality where the design also indicates source." *Esercizio* at 1247. In support of that assertion, the court quoted *WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084 (6th Cir.1983), as stating:

> TS' assertion that its use of the involved design is 'functional,' i.e., 'ornamental' or 'decorative,' is unavailing.... That an item serves or performs a function does not mean, however, that it may not at the same time be capable of indicating sponsorship or origin where aspects of the item are nonfunctional.

*Id., quoting WSM* at 1087.

Therefore, the Sixth Circuit has rejected *Plasticolor's* reliance on the dual purpose of Plaintiffs' trademarks being placed on floor mats. The fact that floor mats bearing Plaintiffs' trademark could be considered harmonious accessories does not preclude Defendant's liability where the trademarks are also capable of indicating sponsorship or origin. *Id.*

Additionally, the *Esercizio* court held that a product feature is not functional simply because it increases the value and appeal of the article.

Moreover, *Pagliero* [*v. Wallace China Co.,* 198 F.2d 339, 95 U.S.P.Q. 45 (9th Cir.1952) ]'s 'important ingredient' formula has been rejected because "[t]rade dress associated with a product that has accumulated goodwill ... will almost always be 'an important ingredient' in the 'saleability' of the product." *LeSportsac[, Inc. v. K Mart Corp.,* 754 F.2d 71, 77 (2nd Cir.1985) ]. In part because of these concerns, the Ninth Circuit itself later rejected the view that 'any feature of a product which contributes to the consumer appeal and saleability of the product is, as a matter of law, a functional element of that product.' *Vuitton [Et Fils S.A. v. J. Young Enterprises, Inc.,* 644 F.2d 769, 773 (9th Cir.1981) ].

*Esercizio* at 1247. Therefore, contrary to *Plasticolor,* the fact that Defendant's floor mats are more desirable with Plaintiffs' trademarks does not deem those trademarks functional.

The Supreme Court's opinion in *Qualitex Co. v. Jacobson Products Co., Inc.,* 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995), also leads this Court to question the viability of *Plasticolor*'s analysis. The *Qualitex* court described the functionality doctrine as protecting "competitors against a disadvantage (*unrelated to recognition or reputation* ) that trademark protection might otherwise impose, namely, their inability reasonably to replicate *important non-reputation-related product features.*" *Id.* at 169, 115 S.Ct. 1300, (emphasis added). Here, the trademarks Defendant displays on its floor mats are clearly related to Plaintiffs' recognition and reputation. Thus, according to *Qualitex,* the functionality doctrine would not apply to Plaintiffs' trademarks.

Furthermore, the *Qualitex* court emphasized that "[t]he ultimate test of aesthetic functionality ... is whether the recognition of trademark rights would significantly hinder competition." *Id.* at 170, 115 S.Ct. 1300, (citation and quotation marks omitted). As stated in *McCarthy on Trademarks and Unfair Competition,* § 7:65 (4th ed.2000):

In determining whether conferring trade dress protection would unduly restrict 'competition,' the court should not define the market as being identical with plaintiff's product, for, by definition, an injunction would prevent others from imitating, and hence 'competing' as to that design defined in the injunction. Rather, 'competition' should be defined more broadly to include reasonable alternatives for the same purpose, as is done in antitrust law.

Consequently, in *Topps Co. Inc. v. Gerrit J. Verburg Co.,* 1996 WL 719381, 41 U.S.P.Q.2d 1412 (S.D.N.Y.1996), the product category was not the "diamond engagement shaped lollipops" that the defendant copied. Rather, "[t]he product line is lollipops." *Id.* at 1419.

The product category in this case is automobile floor mats. Enforcing Plaintiffs' trademarks in this case will not hinder competition in that product category; Defendant and other floor mat manufacturers can compete in the automobile floor mat market without having to include Plaintiffs' trademarks.

Plaintiffs' right to control the quality of merchandise featuring its trademarks also cautions against a finding that the aesthetic functionality test protects Defendant from liability in this case.

One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark. For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain.

*El Greco Leather Products Co., Inc. v. Shoe World, Inc.,* 806 F.2d 392, 395, 1

U.S.P.Q.2d 1016 (2nd Cir.1986) (citations omitted). Defendant emphasizes the high quality of its mats. Notwithstanding, a finding that the aesthetic functionality of Plaintiffs' trademarks precludes Defendant from being held liable for trademark infringement could result in other manufacturers marketing poorer quality mats with Plaintiffs' trademarks. Such a manufacturer would feel entitled to use Plaintiffs' marks so long as the packaging and backing include disclaimers, even if those disclaimers only reach the purchasers at the point of sale. As a result, members of the general public could be misled into believing that the poor quality mats were manufactured or authorized by Plaintiffs, which could erode Plaintiffs' reputation. The very type of reputational erosion discouraged in *Esercizio* and *Rolex Watch* would occur.[9]

\*    \*    \*    \*    \*    \*

For these reasons, the Court finds that the relevant considerations heavily favor a likelihood of confusion. Further, the Court rejects Defendant's functionality argument and rejects Defendant's claims that its disclaimers are sufficient to alleviate the likely confusion resulting from it sale of mats bearing Plaintiffs' trademarks.

**B. *Dilution***

■ Additionally, Plaintiffs claim that Defendant's have additionally violated the Federal Trademark Dilution Act of 1995 (FTDA), § 1125(c). That section entitles a trademark owner "to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark ...." § 1125(c). The FTDA is a relatively young statute and, because dilution is a nebulous concept, "[i]t is not yet entirely clear how courts should determine whether a junior use causes a senior mark to suffer dilution." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 217 (2nd Cir.1999).

In its Opinion Granting Motion for Preliminary Injunction Pending Appeal, the Court opined that Plaintiffs were unlikely to succeed on the merits of their dilution claim. The Court reasoned that Plaintiffs had not demonstrated that the distinctiveness of their marks have weakened, or were likely to weaken, by virtue of Defendant's use of those marks on its floor mats. In support, the Court quoted the following passage from *Plasticolor*:

> The mats contain clear, legible and accurate depictions of various Ford trademarks and logos. They are sold to the public for use in conjunction with Ford products, giving consumers the opportunity to express their allegiance to their Ford-manufactured automobiles. If anything, such use is likely to increase the distinctiveness of Ford's marks.

*Plasticolor* at 1349.

Upon further consideration, the Court now believes that *Plasticolor* did not properly take into account that the defendant's

---

**9.** The Court furthermore finds Defendant's claim regarding the quality of its floor mats to be unavailing because, "today, the overwhelming majority view is that it is not necessary for plaintiff to prove that the defendant's non-competing goods are of inferior quality." *McCarthy* at § 24:15. According to *McCarthy*, courts reason that they are ill-equipped to judge the respective quality of the goods. Additionally, the infringer's quality may decline in the future. As a consequence, a finding in favor of a defendant due to the high quality of its product at the time of the litigation would place the plaintiff's reputation in the hands of a competitor over whom the plaintiff has no control. *Id. Also see Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259–260, 2 U.S.P.Q.2d 1677 (2nd Cir.1987)("[A] senior user may sue to protect his reputation even where the infringer's goods are of top quality.").

use of Ford's marks would likely cause "blurring" of the source of goods bearing the marks. "[D]ilution by 'blurring' may occur where the defendant uses or modifies *the plaintiff's trademark* to identify *the defendant's goods and services,* raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39, 43 (2nd Cir.1994)(emphasis in original). This explanation of dilution is consistent with 15 U.S.C. § 1127, which defines "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services."

With this fresh understanding of the concept of dilution in mind, the Court will now turn to the FTDA analysis set forth in *Nabisco,* an opinion that was recently endorsed as authoritative by the Sixth Circuit. *V Secret Catalogue, Inc. v. Moseley,* 259 F.3d 464 (6th Cir.2001).

*Nabisco* instructed that a FTDA claim requires proof of five elements:

> (1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark.

*Nabisco* at 215. Importantly, *Nabisco* held that a plaintiff need not submit proof of actual dilution. *Id.* at 223–224. Following *Nabisco,* the Sixth Circuit allows an "inference of likely harm to the senior mark instead of requiring actual proof." *V Secret Catalogue* at 476. The *V Secret Catalogue* court agreed that the FTDA evidenced "an intent to allow a remedy *before* dilution has actually caused economic harm to the senior mark." *Id.,* (emphasis in original).

The third element set forth above is not in dispute in this case; there is no dispute that Defendant uses the marks at issue in commerce. For the reasons that follow, the Court finds that the remaining factors support Plaintiffs' claim of dilution.

### 1. *Fame*

Regarding the first element, Defendant argues that Plaintiffs have submitted insufficient evidence regarding the fame of each their trademarks. The Court agrees that, notwithstanding this Court's familiarity with Plaintiffs' marks and their widespread recognition, Plaintiffs could have provided more evidence to demonstrate fame. Be that as it may, Plaintiffs' argument that Defendant's intentional copying of their trademarks is evidence of their fame rings true. The Sixth Circuit has recognized that " '[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.' " *Esercizio* at 1239, (quoting *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.,* 283 F.2d 551, 558 (9th Cir.1960)). *Also see I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 42 (1st Cir.1998)(citing intentional copying as evidencing secondary meaning); *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.,* 212 F.3d 157, 165 (3rd Cir. 2000)(same).

Moreover, the Court need not ignore its awareness of the fame of Plaintiffs' trademarks. In *Union Carbide Corp. v. Ever-Ready Inc.,* 531 F.2d 366, 381 (7th Cir. 1976), the court expressed this sentiment:

> [W]e find it difficult to believe that anyone living in our society, which has daily familiarity with hundreds of battery-operated products, can be other than thoroughly acquainted with the EVER-EADY mark. While perhaps not many know that Carbide is the manufacturer of EVEREADY products, few would have any doubt that the term was being utilized other than to indicate the single, though anonymous, source. A court

should not play the ostrich with regard to such general public knowledge. We hold that the district court's determination that there was inadequate evidence to find that EVEREADY had acquired a secondary meaning is clearly erroneous. The Court finds that the general public recognizes the marks Ford®, Bronco®, Excursion®, Expedition®, Navigator®, Explorer®, Mustang®, Lincoln®, Mercury®, Mustang®, Ranger®, Mountaineer®, Taurus®, Windstar®, the Ford Thunderbird Logo®, F–150®, F–250®, F–350®, Jaguar® and Aston Martin®, and associates those marks with Plaintiffs' automobiles.

Consequently, the Court finds that Plaintiffs' marks are sufficiently famous. And, it is otherwise undisputed that Defendant began using Plaintiffs' marks after they became famous. Therefore, Plaintiffs have satisfied the first and fourth element necessary to prove an FTDA claim.

### 2. *Distinctiveness*

The FTDA expressly protects only distinctive marks; the more distinctive the mark, the more vulnerable it is to dilution. *Nabisco* at 217–218. In *Nabisco*, the court stressed that there are varying degrees of distinctiveness. It found Pepperidge Farm's Goldfish crackers to be moderately distinctive, reasoning:

> The fish shape has no logical relationship to a cheese cracker. However, we recognize it is not in the highest category of distinctiveness that belongs to a purely fanciful made-up pattern or design, or a made-up word like Kodak. Merchants often use an animal's likeness as a trademark. Furthermore, we recognize that it is not uncommon for children's cookies or crackers to be made in animal shapes.

*Id.* at 217.

Applying the reasoning used in *Nabisco*, the Court finds that the marks F–150®, F–250® and F–350® are fanciful and, thus, of high distinction. The trademark Aston Martin® is also highly distinctive because, even though it is not purely fanciful, the name is unlikely to signify anything in commerce but the automobiles and accessories bearing the name. Since Ford®, Jaguar®, Lincoln®, Mercury®, Mustang®, Bronco®, Taurus®, Windstar®, Excursion®, Expedition®, Navigator®, Moutaineer®, and Thunderbird® are not purely fanciful, but are names that are unrelated in everyday life to automobiles, the Court finds them to enjoy a moderate degree of distinctiveness.

Therefore, Plaintiffs have established the second element of an FTDA claim. Hence, the only remaining factors is the fifth: whether Defendant's use may cause dilution of the distinctive quality of the senior mark.

### 3. *Likelihood of Dilution*

In *V. Secret Catalogue,* the court endorsed the nonexclusive list of factors provided in *Nabisco* for analyzing the likelihood of dilution:

> Those factors are: distinctiveness; similarity of the marks; 'proximity of the products and the likelihood of bridging the gap;' 'interrelationship among the distinctiveness of the senior mark, the similarity of the junior mark, and the proximity of the products;' 'shared consumers and geographic limitations;' 'sophistication of consumers;' actual confusion; 'adjectival or referential quality of the junior use;' 'harm to the junior user and delay by the senior user;' and the 'effect of [the] senior's prior laxity in protecting the mark.'

*V. Secret Catalogue* at 476, (citing *Nabisco* at 217–222).

The distinctiveness of Plaintiffs' trademarks has already been addressed. Fol-

lowing is analysis of the remaining factors for determining the likelihood of dilution.

### a. *Similarity of the Marks*

"The marks must be of sufficient similarity so that, in the mind of the consumer, the junior mark will conjure an association with the senior." *Id.* at 218. In this case, the marks are sufficiently similar; Defendant uses marks that are identical or share the identical names constituting Plaintiffs' trademarks.

### b. *Proximity of the Products*

The proximity of Defendant's products with Plaintiffs is a factor that weighs heavily in favor of a finding of dilution. Although the legislative history reveals that antidilution statutes were aimed mostly at junior uses of trademarks on products unrelated to that of the trademark owners, "as in the hypothetical cases of Buick aspirin, Schlitz varnish, or Kodak pianos," *Id.*, the *Nabisco* court held that dilution is even more likely when the junior user competes with the senior:

> The closer the junior user comes to the senior's area of commerce, the more likely it is that dilution will result from the use of a similar mark.
>
> Consumer confusion—the nub of an action for infringement—is, of course, unnecessary to show the actionable dilution of a famous mark. It does not follow, however, that dilution cannot be found in circumstances that would also support an action for infringement. Consumer confusion would undoubtedly dilute the distinctive selling power of a trademark. *There can be little doubt that a junior use of Buick, Schlitz or Kodak on automotive equipment, drinks, and photographic products would lessen the distinctiveness of the senior mark at least as much as if the junior use were on unrelated products, such as aspirin, varnish and pianos.* We can see no reason not to apply the antidilution statute to use on competing or closely related products, where likelihood of confusion, and thus infringement, might also be found.
>
> Indeed, there may well be cases in which proximity may be necessary to dilution. . . . For example, as noted above, a fish shape, while reasonably distinctive, is not as distinctive as a made-up word like Kodak. If Pepperidge Farm were seeking to enjoin the use of a fish-shape as the logo for an automobile, a newspaper, or a line of sports clothes, much less as the mark of a fish merchant or fish restaurant, it seems questionable whether dilution should be found. But here the junior user's area of commerce is identical to the senior's. A second major seller of goldfish-shaped, orange-colored, cheddarflavored, bite-sized crackers can hardly fail, in our view, to dilute the distinctiveness in the eyes of the consumers of the senior mark in a goldfish-shaped, orange-colored, cheddar-flavored, bite-sized cracker.

*Id.* at 219, (emphasis added).

Hence, according to *Nabisco*, there can be little doubt that a junior use of Plaintiffs' trademarks on automobile equipment would tend to lessen their distinctiveness. If Plaintiffs sought to enjoin manufacturers of products that do not compete with Plaintiffs from using "expedition," "excursion" or others words making up their other arbitrary marks, their efforts to prove dilution would be more doubtful.

In an affidavit, Levine states that a website search of the word "expedition" revealed 110 registered uses, including one pertaining to motor homes and another to trailers for snowmobiles and motorcycles. (Levine Aff. at ¶ 27). Additionally, he claims that there were 18 different registered trademarks including the word "excursion," including a registration by a

manufacturer of "car loud speakers," and a registration by an unnamed manufacturer of automobiles. (*Id.* at ¶ 28). Levine's affidavit states that the copies of the downloaded information are attached in two exhibits, but no such attachments are provided. Further, Defendant has not shown that Plaintiffs manufacture or market motor homes, trailers for snowmobiles and motorcycles or car loud speakers. Defendant moreover has failed to show that the unnamed automobile manufacturer who registered the name "excursion" ever actually manufactured or marketed a vehicle or automobile accessory using that name or that the other manufacturer's mark ever achieved fame. For these reasons, the other alleged registrations cited by Defendant do not diminish the distinctive quality of Plaintiffs' marks in the relevant area of commerce.

### c. Interrelationship Among the Distinctiveness of the Senior Mark the similarity of the junior mark, and the proximity of the products

In Nabisco, the court described the interrelationship among the distinctiveness of the senior mark, the similarity of the junior mark, and the proximity of the products as follows:

> The weaker any of the three factors may be, the stronger the others must be to make a case of dilution. To choose one of many possible hypothetical examples to illustrate this interdependence: with a highly distinctive senior mark, like Chevrolet for cars, even an only moderately similar junior mark—such as Chevremont—might dilute the distinctive quality of the senior if it were used in the automotive industry, but probably not if the junior were used in a distant area like perfumes.

*Nabisco* at 219–220.

This case presents trademarks that are moderately to highly distinctive, identical or nearly identical juniors marks, and Defendant's use of its marks in direct competition with Plaintiffs. Whereas the hypothetical Chevremont might dilute the distinctive quality of Chevrolet in the automobile industry, there can be no question that Defendant's use of marks that are identical or nearly identical to Plaintiffs in the automobile accessories mark could lead to dilution.

### d. Shared Consumers and Geographic Limitations

This factor, addressing consumer overlap, "is meaningful because dilution requires that a mark become less distinctive to consumers. If the consumers who buy the products of the senior user never see the junior user's products or publicity, then those consumers will continue to perceive the senior user's mark as unique, notwithstanding the junior use." *Nabisco* at 220. Here, the evidence reveals shared consumers. Defendant marketed its mats via some of Plaintiffs' authorized dealerships, and like Plaintiffs, targets retail purchasers of vehicles manufactured by Plaintiffs.

### e. Sophistication of Consumers and Actual Confusion

Neither likelihood of confusion nor actual confusion are necessary to sustain a blurring claim. *Nabisco* at 221. Notwithstanding, such confusion would lessen distinction and is thus considered probative. *Id.* The Court has already held that Plaintiffs have submitted no evidence of actual confusion. On the other hand, the Court has also opined that the average purchaser of Defendant's mats is not likely to have any sophistication regarding the product, which deems confusion more likely. *Id.* at 220.

### f. *Adjectival or Referential Quality of the Junior Use*

To explain the factor regarding the adjectival or referential quality of the junior use, the *Nabisco* court offered the following example: "[T]he shape of Pepperidge's Goldfish crackers is arbitrary as a cheese cracker, but would be adjectival if used on a sign by a fish market or fish restaurant.." *Id.* at 221. The court then explained:

> The stronger the adjectival association between the junior use and the junior area of commerce, the less likelihood there is that the junior's use will dilute the strength of the senior's mark. The logical association between a fish image and a fish business would lead consumers to understand the fish sign as descriptive of the junior's business, regardless whether it is also being used as a mark. Consumers would be unlikely to draw a diluting association between the junior mark and the Goldfish cracker. Similarly, if the hypothetical 'Chevremont' mark in our earlier example were used on cheese, rather than automobile equipment, it would be less likely to dilute the distinctive quality of Chevrolet's mark.

*Id.*

Defendant argues that use of Plaintiffs' trademarks on its floor mats is akin to a fish market using a fish sign. Its mats are merely referential "signs" that customers place on the inside of their vehicles. This argument is wholly without merit.

A fish sign on a fish market is descriptive, or adjectival, of its business. The marks Explorer®, Navigator®, Expedition® or the like do not describe Defendant's business. And, whether or not Defendants' customers use their mats as a sign inside their vehicles is irrelevant. It is the "junior use" that is at issue, and Defendant's use of Plaintiffs' trademarks is neither adjectival of or referential to the mats it sells. Rather, in the automobile accessories market, Plaintiffs' trademarks are fanciful or arbitrary.

### g. *Harm to Junior User, Delay by the Senior User and Effect of Senior's Prior Laxity in Protective the Mark.*

"A factor we have noted in considering infringement is whether the senior user's effort to enjoin the junior use was made with reasonable promptness and whether the junior user will suffer harm resulting from any such delay." *Nabisco* at 222. In this case, Defendant has provided no competent evidence that Plaintiffs delayed enforcement against it. More importantly, even if there was some delay, Defendant has suffered no harm as a result. Defendant has not and cannot demonstrate that it has invested resources to enhance the goodwill of the marks at issue; any goodwill associated with those trademarks is due to Plaintiffs' investments.

Defendant does claim that Plaintiffs have been lax at protecting its mark. In particular, Defendant submits evidence showing that twenty-seven of Plaintiffs' authorized dealers sell accessories bearing Plaintiffs' trademarks that are neither manufactured or authorized by Plaintiffs. Plaintiffs point out that the twenty-seven dealerships cited represent only a fraction of the total and that Defendant's claim of widespread unauthorized sales in dealerships is, therefore, overstated. Nevertheless, Defendant also cites evidence that Plaintiffs do not police their dealerships to determine whether they are selling unauthorized accessories. (*Dft's Mot.*, Exs. 8–10, 20–23). Plaintiffs represent that they have provided the Defendant with several hundred trademark enforcement files, but they failed to present any evidence regarding their enforcement to this Court. In particular, Plaintiffs have not shown that

they have taken action to reduce the sale of unauthorized accessories in their dealerships.

Despite this, the Court is mindful that "a trademark owner's failure to pursue potential infringers does not in and of itself establish that the mark has lost its significance as an indicator of origin." *Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1080 (5th Cir.1997). Defendant's argument .that Plaintiffs have been lax in policing its authorized dealerships is its best, but is alone insufficient to demonstrate that Plaintiffs' marks have lost their distinctiveness.

\*　　\*　　\*　　\*　　\*　　\*

In summary, Defendant has shown that Plaintiffs have been lax in policing their dealerships, but Plaintiffs have otherwise made a strong showing that Defendant's use of their trademarks will likely cause dilution. Consequently, the Court will grant summary judgment in favor of Plaintiffs on the issue of dilution.

### C.  *Laches and Acquiescence*

In its Answer to Plaintiffs' Amended Verified Complaint, Defendant asserted that the doctrine of laches and acquiescence preclude Plaintiffs' from obtaining the relief requested. Defendant's laches defense requires consideration of "(1) whether the owner of the mark knew of the infringing use; (2) whether the owner's delay in challenging the infringement of the mark was inexcusable or unreasonable; and (3) whether the infringing user was unduly prejudiced by the owner's delay." *Kellogg Co. v. Exxon Corp.,* 209 F.3d 562, 569 (6th Cir.2000). An acquiescence defense is akin to laches, but it additionally requires a showing of active consent or conduct in the nature of estoppel. *Id.* The Court finds that Defendant has set forth

no evidence to support its laches or acquiescence defenses and that, in any event, Defendant's laches claim cannot bar Plaintiffs' request for injunctive relief. *Id.* at 568.

### D.  *Naked Licensing*

Defendant alleges in its Motion for Summary Judgment that Plaintiffs have lost their trademark rights due to naked licensing. This argument is asserted despite the fact that the Court already rejected it when granting Plaintiffs' Motion to Dismiss Defendant's Counterclaims. *(Plt's Opp. Br.,* Ex. 21 at 18–19).

To support its naked licensing claim, Defendant relies upon Plaintiffs' failure to supervise the sale of accessories by authorized dealerships. Defendant argues that dealership sales of unauthorized accessories is rampant in the dealerships and that those accessories are of varying quality.

██ "Naked (or uncontrolled) licensing of a mark occurs when a licensor allows a licensee to use the mark on any quality or type of good the licensee chooses." *Stanfield v. Osborne Industries, Inc.,* 52 F.3d 867, 871 (10th Cir.1995). During the hearing of Plaintiffs' Motion to Dismiss, this Court concluded that Defendant's factual allegation did not support a claim of naked licensing. That conclusion has not changed. Defendant has not showed that Plaintiffs have *licensed* their dealerships to use their trademarks in any manner the dealerships chooses.[10] In fact, the Ford Sales & Service Agreement strictly circumscribes the dealerships' use of Plaintiffs' trademarks. *(Plt's Opp.,* Ex. 27 at 18).

The Court, therefore, rejects Defendant's naked licensing defense.

---

**10.**  This conclusion applies equally to dealerships owned by Ford Investment Enterprises Corporation, which is a subsidiary of Ford Motor Company. There is no evidence that Ford licensed its subsidiary to use Plaintiffs' trademarks as it chooses.

### E. *Unclean Hands Doctrine*

■ Defendant also argues in its Motion for Summary Judgment that Plaintiffs are guilty of unclean hands. The unclean hands arguments rests in part upon Plaintiffs' dealers' sale of unauthorized accessories containing Plaintiffs' trademarks. In *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir.1995), the court stated, "The concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." (Quotation marks and citation omitted). In this case, Defendant provides no factual support for its claim that the unauthorized sale by Plaintiffs' dealers constituted "fraud, deceit, unconscionability or bad faith." Even if the dealers have engaged in such misconduct, Defendant provides no legal authority to suggest that the dealers' actions could constitute "unclean hands" on the part of Plaintiffs. This is true even of dealerships owned by Ford Investment Enterprises Corporation, which is a subsidiary of Ford Motor Company. Under basic corporate principles, a subsidiary is treated as a separate legal entity from its parent. *Skidmore, Owings & Merrill v. Canada Life Assur. Co.*, 907 F.2d 1026, 1027 (10th Cir.1990); *Jemez Agency, Inc. v. CIGNA Corp.*, 866 F.Supp. 1340, 1343 (D.N.M.1994).

Defendant further claims that Ford has engaged in intentional misrepresentation which constitutes unclean hands. When granting Plaintiffs' Motion to Dismiss Defendant's Counterclaims, the Court already rejected Defendant's misrepresentation claim. Additionally, the misrepresentation Defendant alleges was on the part of a dealership owned by Ford's subsidiary rather than on the part of Ford. Hence,

Defendant's misrepresentation claim continues to be without merit.

For these reasons, this Court rejects Defendant's unclean hands defense.

### F. *False Advertising*

Defendant seeks summary judgment of Plaintiffs' false advertising claim.

> To prove a claim for false advertising under the Lanham Act, a plaintiff must establish that: (1) the defendant has made false or misleading statements of fact concerning his product or another's; (2) the statement actually or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff.

*Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 323 (6th Cir.2001).

The sole false or misleading statement Plaintiff relies upon is the representation in *Stylin' Concepts* that Defendant's mats were "Ford approved." However, Defendant has submitted evidence that that misrepresentation was the fault of the catalog, and Plaintiff has proffered no evidence to the contrary. Consequently, the Court will grant summary judgment in Defendant's favor of the Plaintiffs' false advertising claim.

### G. *Proposed Modification of Labeling*

Defendant proposes to modify its mats by putting a "Lloyd Mats" logo on the face of the mats. (*See Dft's Opp.*, Ex. 9). This modification would be inadequate for two reasons. First, consumers past the point of sale will still have no indication that the mats are not licensed by Plaintiffs. "Fur-

thermore, disclaimers will never remedy dilution because consumer confusion is irrelevant in establishing a dilution claim." *Liquid Glass Enterprises, Inc. v. Dr. Ing. h.c.F. Porsche AG,* 8 F.Supp.2d 398, 405 n. 5 (D.N.J.1998).

### H. *Attorneys Fees*

Plaintiffs seek an award of attorneys fees. Under the Lanham Act, "the court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). "Although the precise definition of the term 'exceptional cases' is uncertain, the legislative history clearly suggests that it would involve cases in which the infringement was malicious, fraudulent, willful, or deliberate." *Hindu Incense v. Meadows,* 692 F.2d 1048, 1051 (6th Cir.1982). Inasmuch as Defendant has engaged in intentional copying of exact replicas of Plaintiffs' trademarks despite having his application to become a licensee twice rejected, the Court finds that Defendant's infringement was willful and deliberate. Further, in light of the fact that the *Plasticolor* opinion was vacated and based upon outdated authority, Defendant's alleged reliance on that opinion was reckless.

Defendant cites *Hindu Incense* as holding that, generally, attorney fees are not awarded pursuant to § 1117 where there has been no loss of sales due to the infringement. *Id.* at 1052. But Defendant's intentional commercial use of Plaintiffs' trademarks despite being denied a license distinguishes this case from *Hindu Incense,* where the defendant mistakenly believed that the plaintiff had ceased using the trademark at issue. *Id.* This case is also distinguishable from *VIP Foods, Inc. v. Vulcan Pet, Inc.,* 675 F.2d 1106, 1107 (10th Cir.1982), upon which *Hindu Incense* relied to state that attorney fees are generally unavailable when there has been no loss of sales. The *VIP Foods* court's holding that attorney fees were not appropri-

ate was based in part upon the finding that the defendant had not willfully infringed upon the plaintiff's trademark. *Id.*

Unlike *Hindu Incense* or *VIP Foods,* this case presents the exceptional findings of willful and deliberate infringement. The Court will, thus, award Plaintiffs' reasonable attorney fees.

### I. *Scope of Requested Injunction*

Defendant alleges that the injunction Plaintiffs request is too broad. In *Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 749 (2nd Cir.1994), the court cautioned that, although an injunction need not be so precise as to predict exactly what the defendant will do next, it cannot be "so broad as to prohibit generally all unlawful activity." The injunctive order under scrutiny provided such general commands as prohibiting the defendant from "engaging in unfair competition ... through their use of the trademark and trade name" of the plaintiff. *Id.* at 748, n. 10.

The Court agrees that some of Plaintiffs' requests for injunctive relief set forth in their Amended Verified Complaint falls under the category of prohibiting all unlawful activity. Plaintiffs' shall submit a proposed permanent injunction that is more appropriate in scope.

### IV. *Conclusion*

For the foregoing reasons, **THE COURT GRANTS** Plaintiffs' Motion for Summary Judgment [**document 115**]. **THE COURT FURTHER GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment [**document 126**]. Specifically, the Court grants Defendant's Motion as it relates to Plaintiffs' false advertising claim, but otherwise denies it. Plaintiffs shall submit their specific request for attorney fees along with proofs supporting the amount requested, and shall submit a proposed

permanent injunction that is consistent with this Opinion.