**LIZ CLAIBORNE, INC. and L.C., Licensing, Inc., Plaintiffs,**

**v.**

**MADEMOISELLE KNITWEAR, INC., individually and d/b/a The Mill Ltd. Sweater Factory Outlet; Charles Stefansky; various John Does, Jane Does and XYZ Companies, Defendants.**

**No. 96 Civ. 2064(RWS).**

United States District Court, S.D. New York.

Sept. 29, 1997.

---

Lewin & Laytin, P.C., New York City, for Plaintiffs, Harley I. Lewin, G. Roxanne Elings, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, L.L.P., New York City, for Defendants, John W. Schryber, Ross D. Cooper, Harold E. Pizzetta, III, of counsel.

## OPINION

SWEET, District Judge.

Liz Claiborne, Inc. and L.C. Licensing, Inc. (collectively, "Claiborne"), has moved for summary judgment under Rule 56, Fed. R.Civ.P. against the defendants Mademoiselle Knitwear, Inc. ("Mademoiselle"), Charles Stefansky ("Stefansky"), and Shraga Newhouse ("Newhouse" and collectively, the "defendants"). Claiborne has alleged (1) trademark counterfeiting, trademark infringement, unfair competition and/or false designation of origin arising under the Trademark Act of 1946, 15 U.S.C. 1051, *et seq.*, as amended by the Trademark Counterfeiting Act of 1984, Public Law 98–473 (the "Lanham Act"); (2) trade name infringement, unfair competition, unfair trade practices and trademark dilution under the laws of the State of New York; (3) fraud; (4) breach of contract; and (5) breach of covenant of good faith. Claiborne seeks (1) a permanent injunction; (2) treble damages in the amount of $2,635,099; (3) profits; (4) prejudgment interest; (5) reasonable attorney's fees and costs; (6) release from all bonds posted by Claiborne; (7) destruction of all Claiborne merchandise in Mademoiselle's possession; and (8) an injunction ordering that plaintiffs have no obligation to order the manufacture of merchandise from, or conduct any other business activity with, defendants.[1]

---

1. The demand for an injunction against future obligations to do business with Mademoiselle, which allegedly arises from a 1995 union contract, is moot. Claiborne conceded in oral argument that "all matters between the union and Claiborne have been settled whereby there is no requirement to proceed with Mademoiselle beyond the June 30th [1997] expiration date of the 1995 commitment." Transcript of Oral Argument, June 4, 1997, at 1–2.

For the reasons set forth below, the motion is denied.

### Parties

Liz Claiborne, Inc. is a Delaware corporation, having its principal place of business at 1441 Broadway, New York, New York.

L.C. Licensing, Inc. is a wholly owned subsidiary of Liz Claiborne, Inc. and is a Delaware corporation, having its principal place of business at 1441 Broadway, New York, New York.

Mademoiselle Knitwear, Inc. is a New York corporation with an office and/or principal place of business at 930 Flushing Avenue, Brooklyn, New York.

Charles Stefansky is an individual residing within the State of New Jersey and at the times relevant to this motion was employed by Mademoiselle.

Shraga Newhouse is an individual residing within the State of New York and at the times relevant to this motion was President of Mademoiselle.

### Prior Proceedings

The prior proceedings of this case are set forth in the previous opinions of the Court, familiarity with which is assumed. *See Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.,* 96 Civ. 2064, 1997 WL 53184 (S.D.N.Y. Feb.10, 1997); *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.,* 96 Civ. 2064, 1996 WL 668862 (S.D.N.Y. Nov.19, 1996); *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.,* 96 Civ. 2064, 1996 WL 346352 (S.D.N.Y. June 25, 1996).

Claiborne filed the instant motion on April 9, 1997. Oral argument was heard on June 4, 1997, at which time this motion was considered fully submitted.[2]

### Facts

Claiborne designs, produces, and distributes apparel and other merchandise utilizing trademarks registered with the United States Patent and Trademark Office. Claiborne utilizes approximately two hundred contractors worldwide to manufacture goods to its specifications which bear the Claiborne trademarks.

Since at least 1992, Mademoiselle and Claiborne established a relationship whereby Mademoiselle would produce knitwear for Claiborne. Claiborne orders merchandise from Mademoiselle by issuing a "cutting ticket." The cutting ticket provides the quantity, style number and trademark to be used.

### A. Sale of Irregulars and Overruns

Manufacturing knitwear is not a perfect science, and from time-to-time there are (1) goods that do not pass quality control inspections ("Irregulars") and (2) goods that pass the quality inspections but exceed by more than five percent the quantity specified in the cutting ticket ("Overruns").

Although both Mademoiselle and Claiborne agree that Mademoiselle was permitted to sell Irregulars and Overruns to third-parties, they do not agree on the scope of the authority granted by Claiborne. The dispute involves three terms of the purported agreement: (1) whether Claiborne had a right of first refusal to purchase Irregulars and Overruns before Mademoiselle could sell them to third-parties; (2) whether Mademoiselle was obligated to remove the Claiborne labels, or otherwise mark the garments, before selling the merchandise to third-parties; and (3) how long Mademoiselle was required to wait before selling the garments to third-parties.

#### 1. Right of First Refusal

Mademoiselle asserts that Claiborne conferred on it broad authority to sell-off Claiborne garments. To support this assertion, Mademoiselle relies on testimony from Jack Listanowsky ("Listanowsky") and Larry Burack ("Burack"), who were "the senior Claiborne officials responsible for the administration of the Claiborne–Mademoiselle relationship." Defendants Memorandum of Law . In Opposition to Liz Claiborne's Motion for Summary Judgment, May 23, 1997, at 2 [hereinafter, "Def. Mem."]. According to Burack and Listanowsky, neither of whom are current Claiborne employees,

---

**2.** Claiborne did file with the Court on September 8, 1997, a "Supplemental Memorandum in Support of Plaintiffs' Motion for Summary Judgment." However, this Memorandum arrived too late to be considered for purposes of this Motion.

they told Newhouse that Mademoiselle could sell any "excess inventory"[3] that Mademoiselle had in lots of less than two hundred pieces of a given style without offering the garments first to Claiborne. Lots of over 200 garments could be sold to third-parties only if first offered to and refused by Claiborne.

This policy was amended in or around November 1995, according to Mademoiselle, when Claiborne allegedly lifted the first refusal restriction and authorized Mademoiselle to sell-off all excess garments without first notifying Claiborne. Mademoiselle relies on the testimony of Newhouse for this proposition.

Although Claiborne concedes that Mademoiselle did have authority to sell-off seconds to third-parties, they claim that all quantities over 200 pieces of a give style must be first offered to Claiborne. This 200–piece requirement, according to Claiborne, was never lifted. Accordingly, Claiborne claims, if any Claiborne garments were sold by Mademoiselle to third-parties without first offering them to Claiborne, then Mademoiselle exceeded the authority granted.

### 2. *Labels and Marking*

Mademoiselle asserts, again relying on the testimony of Burak and Listanowsky, that

Claiborne authorized them to sell all garments in a lot that had passed the final factory inspection as "first quality" without removing the Claiborne labels or otherwise marking the garments.[4] Furthermore, garments that failed the inspection could be sold if (1) the hangtag was stamped "irregular" or (2) the Claiborne label and hangtag were removed.[5]

Claiborne, on the other hand, asserts that prior to selling Irregulars Mademoiselle was required to (1) remove all Claiborne identification; (2) cut the labels; or (3) mark the goods "irregular." Claiborne denies that the right of first refusal and waiting period were lifted, stating that "defendants rely upon the unsupported and conclusory testimony of Newhouse concerning an alleged telephone conversation he had with Richard Owen" and that such testimony "does not comport with reality and is so incredible as to not raise a question of fact." Reply Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, June 2, 1997, at 10 [hereinafter "Reply"]. Claiborne does not clearly explain how overruns should be labeled.[6]

### 3. *Waiting Period*

Mademoiselle asserts that, prior to selling to third-parties, it must wait three months after Claiborne *first sold* the design at issue to its own customers.[7] Furthermore, Made-

---

**3.** Mademoiselle defines "excess inventory" as comprised of garments that fall within one of the following categories: (i) garments that did not pass Claiborne's final inspection of the garments ("seconds" or "irregulars"); (ii) garments completed after the delivery date specified in the order (either originally or as amended) ("stragglers"); and (iii) "first quality" garments completed in quantities in excess of 105 percent of the amount ordered ("overruns"). Def. Mem. at 2 n. 2.

**4.** Contrary to Mademoiselle's assertion, Burak did not so testify. Burak stated that Mademoiselle could sell to a third-party as a first quality product garments that passed the Claiborne inspection, but he did not say it could be sold with the Claiborne label (which contained the Claiborne trademarks). *See* Schryber Declaration, Exhibit A, Burak Deposition at 18 [hereinafter "Burak Dep."].

Listanowsky did testify that first-quality goods would not have to be marked, while those that did not pass Claiborne's inspection would have to be identified clearly to the customer. See Schryber Declaration, Exhibit B, Listanowsky

Deposition at 218–20 [hereinafter "Listanowsky Dep."].

**5.** Burak did *testify that garments that did not* pass the quality inspection must be stamped irregular and there was nothing else Mademoiselle needed to do. See Burak Dep. at 18.

**6.** Although Claiborne characterizes the overrun/irregular policy as an "uncontested" fact, citing its Statement of Undisputed Facts pursuant to Local Rule 56.1(a) (asserting policy is undisputed), in fact, like most issues in this case, it is vigorously contested. *See* Defendant's Rule 56.1 Response to Plaintiff's Statement of Undisputed Facts And Defendants Statement of Genuine Issues Which Require Trial, May 27, 1997 (denying policy is undisputed).

**7.** Neither of the references cited by Mademoiselle actually state that the waiting period began "after Claiborne first had sold the design at issue to its own customers." Listanowsky testified that Mademoiselle must wait "two seasons . . . never putting it into a store that was . . . selling the same merchandise at the same time." Lista-

moiselle asserts that in 1995, when Claiborne lifted the right of first refusal requirement, the waiting period restriction was also eliminated. Mademoiselle was still subject, however, to the restriction to not sell Claiborne garments that were the subject to a pending order from Claiborne.

Claiborne agrees that there was a three-month waiting period, however, they dispute when the three-month period begins. Claiborne states the purpose of the waiting period is to avoid simultaneous appearance of Claiborne's garments in full-price retail stores and discount outlets. Accordingly, they challenge Mademoiselle's interpretation as incredible. Claiborne does not, however, clearly define when the three-month period does begin.

Claiborne alleges that Mademoiselle sold garments at outlet stores it operated outside the scope of these procedures:

(1) the first refusal requirement was allegedly violated by selling styles that were never offered first to Claiborne [8] or which were offered and purchased by Claiborne; (2) the waiting period was allegedly violated by selling styles before the required three-month delay; and (3) the label marking requirement was allegedly violated by selling sweaters with Claiborne hang tags and labels.[9]

## B. Offers In Violation of Authority

Claiborne alleges that a Mademoiselle employee, Stefansky, offered to *intentionally* plan overruns of Claiborne sweaters, in violation of any authorization.[10] To support this proposition, Claiborne cites a taped conversation between its private investigator and Stefansky. During the conversation, Stefansky allegedly offered to: (1) supply Claiborne garments on a continuous basis; (2) place Claiborne trademark labels on labelless sweaters; and (3) produce planned overruns of Claiborne merchandise for sale to third-parties.

Mademoiselle asserts that they never did "sell or offer to sell ... anything but old leftovers in quantities of less than 200 pieces," citing Stefansky's taped statement that "overruns we never did." Def. Mem. 35. They do not, however, explain or directly address Stefansky's earlier taped statement that he would intentionally produce extra garments.

## C. Affirmative Defenses

Mademoiselle also asserts three affirmative defenses. First, they allege that Mademoiselle's liability, if any, would be barred by the doctrine of laches since Claiborne was aware of, and did not object to, the outlet store sales for many years. Second, Mademoiselle alleges that Claiborne acquiesced in Mademoiselle's selling-off the garments in its outlet stores. Third, Mademoiselle asserts that any liability is barred by Claiborne's alleged unclean hands. Mademoiselle characterizes Claiborne's action as a "sham" brought with the intention of abrogating a union contract that allegedly bound Claiborne to order a certain quantity of garments per year from Mademoiselle, which was a

---

nowsky Dep. at 210–211. Burak testified that the waiting period was "at least a period of three months" but apparently did not state when the three-month period began. Burak Dep. at 41.

**8.** Claiborne presents an affidavit of an expert who calculates that Mademoiselle produced at least 75,000 sweaters that were never reported to Claiborne. The expert based the calculation on various parameters including amount of raw material fed into the Mademoiselle production lines. Mademoiselle disputes these figures, stating that the reports Claiborne's expert relied on were inaccurate and that the expert's methodology did not account for, *inter alia*, fall-off and other production problems.

**9.** Mademoiselle, of course, disputes Claiborne's calculation of the number of irregular or overrun garments sold to third-parties. Since we deny summary judgment at this time, we need not address the issue of the veracity of these numbers, which is particularly relevant to the question of damages.

**10.** Stefansky allegedly told Claiborne's undercover investigator that, if he established a buyer-seller relationship, then in the future he would call him and say: "hey, I'm doing this for Claiborne for 20,000 pieces, do you want me to stick in 5,000 pieces for you.... I'll tell the knitting manager, please add to the plan X amount of dozens." Declaration of James F. Perrone in Support of Plaintiffs' Motion for Summary Judgment, April 16, 1997, Exhibit A, Stefansky Tape Transcript, at 66–67 [hereinafter "Stefansky Tr."].

union shop. By abrogating the union contract, Claiborne could divert production overseas, and thereby significantly increase its profits. Mademoiselle alleges that this lawsuit is "baseless, and was unilaterally manufactured by Claiborne" to avoid the union commitment. Def. Mem. at 32–33.

## Discussion

### I. Standard of Review

Under the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). See also Keywell Corp. v. Weinstein, 33 F.3d 159, 163 (2d Cir.1994) (a party is entitled to summary judgment if "resolving all ambiguities and drawing all factual inferences in favor of the non-moving party, there is no genuine issue of material fact to be tried"); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions."). "Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); Donahue v. Windsor Locks Bd. of Fire Comm'rs., 834 F.2d 54, 57 (2d Cir.1987). However, the mere existence of disputed factual issues is

insufficient to defeat a motion for summary judgment. See Knight v. United States Fire Ins. Co., 804 F.2d 9, 11–12 (2d Cir.1986). The disputed issues of fact must be "material to the outcome of the litigation," id. at 11, and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. With respect to materiality, "substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

### II. There Exists a Genuine Issue Of Material Fact Regarding the Scope of Authority to Sell–Off Irregulars and Overruns

Section 32 of the Lanham Act, 15 U.S.C. § 1114(1), states that "any person who shall, without consent of the registrant—(a) use in commerce any reproduction, counterfeit [or] copy ... of a registered mark in connection with the sale [or] offering for sale of any goods ... in connection with which such use is likely to cause confusion ... shall be liable in a civil action by the registrant." Therefore, to establish liability Claiborne must prove by the preponderance of the evidence that: (1) the mark was registered; (2) Mademoiselle did not have consent to use the mark; (3) Mademoiselle did use the mark in commerce in connection with either the sale or the offering for sale of goods; and (4) the use of the mark was likely to cause confusion. Although there is no dispute here about the validity of the registration of the marks, the remaining three elements are disputed by Mademoiselle.[11]

11. Claiborne also claims liability under Section 43(a) of the Lanham Act, which makes liable any person who uses in commerce in connection with goods or services "any false designation of origin ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the ...

association of such person with another person, or as to the origin ... of his or her goods ... by another person." This section provides protection for unregistered marks and "its purpose is to prevent confusion regarding a product's source ... and to enable those that fashion a product to

## A. *The Garments Are Not Genuine Claiborne Garments For Lanham Act Purposes.*

■ Mademoiselle's argument that the Claiborne garments were "genuine" and therefore may not be subject to trademark infringement is not supported by the law. The Second Circuit in *El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir.1986), held that the a shoe reseller was liable under the Lanham Act for selling shoes with the plaintiff's trademark attached that were manufactured without the authorization of the trademark holder. The shoes were manufactured by a Brazilian company pursuant to an agreement between the trademark holder and the manufacturer. The trademark holder accepted the initial shipments and then cancelled the remaining order. The manufacturer, however, sold the cancelled-but-already-manufactured shoes with the trademark to the reseller. Defendant claimed that the shoes were genuine, and therefore their sale could not infringe the trademark holder's rights. The court stated that "[t]he mere act of ordering a product to be labeled with a trademark does not deprive its holder of the right to control the product and the trademark." *Id.* at 395. Accordingly, the court held that the shoes sold without plaintiff's permission could not be genuine. *Id.* at 395.

■ It is well settled that sale of genuine goods without authorization by the trademark holder generally will not constitute trademark infringement. *See Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir. 1992) ("As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner."). Such cases, however, usually arise when the initial sale of the trademarked goods was authorized, and the second or subsequent sale is contested. At that juncture, the first sale is exhausted. *See Osawa & Co. v. B & H Photo*, 589 F.Supp. 1163, 1173 (S.D.N.Y.1984) (under the exhaustion doctrine, "a markhold-

er may no longer control branded goods after releasing them into the stream of commerce. . . . Down the line retailers are free to display and advertise the branded goods. Secondhand dealers may advertise the branded merchandise for resale in competition with the sales of the markholder" (emphasis added)). The question of whether a good is genuine, however, presupposes the initial sale was authorized. As commented on in the Restatement: "Trademarked goods produced by a manufacturer under contract with the trademark owner are not genuine goods until their sale under the mark is authorized by the trademark owner. Thus, if the trademark owner rejects the goods, the manufacturer may not use the mark in reselling the goods to others." Restatement (Third) of Unfair Competition § 24, comment c (1995).

*Polymer Tech. Corp. v. Mimran*, 37 F.3d 74 (2d Cir.1994), cited by defendants, is inapposite. In *Polymer*, the plaintiff, a distributor of ophthalmic products including contact lens solutions, sought a preliminary injunction against a distributor of ophthalmic lens care products. The defendant obtained plaintiff's products from plaintiff's authorized distributors and then resold them to wholesalers and retail drug stores. *Id.* at 77. Plaintiff sought to prevent defendant from purchasing or selling their products on the theory that they intended the sales to be to professional care givers only. In *Polymer*, the goods were sold by plaintiff to plaintiff's authorized distributor, who in turn sold it to defendants. *Id.* at 78. Therefore, the question presented concerned the rights of the trademark holder to downstream resales of the product, and not the initial sale.

Mademoiselle's reliance on *DEP Corporation v. Interstate Cigar Company, Inc.*, 622 F.2d 621 (2d Cir.1980), is similarly off-point. The case involved downstream sales of a soap product by a discounter and it was not claimed that the product was obtained other than after the authorized first sale by the

---

differentiate it from others on the market." *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217 (2d Cir.1987).

Here, the issue of scope of authority that will be dispositive on liability under Section 32 will

also determine liability under Section 43(a). Therefore, we will not separately consider the Section 43(a) claim.

trademark rights holder. *Id.* at 621. Although, as the Second Circuit said in dicta,[12] it may be "anomalous" that a trademark infringement action would lie where the soap sold by defendant "is in fact genuine and not spurious," such is not the case here. *Id.* at 622 n. 1. *See also Warner–Lambert Co. v. Northside Dev. Corp.,* 86 F.3d 3, 8 (2d Cir. 1996) (downstream reseller of cough drops enjoined on grounds trademark infringed by failure to abide by trademark holder's quality controls).

Therefore the issue raised here of whether the goods are genuine is merely duplicative of the central question: whether Mademoiselle's alleged sales of, and offers to sell, Claiborne garments were authorized. If the first sale by Mademoiselle was not authorized, then the garments cannot be genuine for infringement purposes.

**B. There Exists a Genuine Issue Of Material Fact Regarding the Scope of Authority to Sell–Off Seconds and Overruns**

■ While Claiborne may have the better argument on the affidavits regarding the scope of authority granted to Mademoiselle to manufacture and sell sweaters with Claiborne trademarks, particularly in light of the absence of documentary proof showing consent, for summary judgment purposes there is a genuine issue of material fact. Mademoiselle has sufficiently refuted Claiborne's claim regarding the 200–piece rule, marking policy and waiting period to present a genuine issue of fact. Furthermore, the present record has too many gaps which need to be filled to complete Claiborne's explanations. For example, Claiborne does not adequately explain how the three-month waiting period should have been administered or how the Overrun sweaters should be marked. As the Supreme Court stated, "[i]t is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavits is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" *Pol-*

*ler v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Here, the determination of the actual scope of authority will turn on the credibility of the individual witnesses, and therefore summary judgment is precluded.

**III. There Exists a Genuine issue Of Material Fact Regarding Whether Stefansky's Taped Statements Constitute An "Offer to Sell" For Lanham Act Purposes**

■ The Lanham Act provides that merely "offering for sale" a good is sufficient to find liability. 15 U.S.C. § 1114(1). In *Vuitton Et Fils, S.A. v. Crown Handbags,* 492 F.Supp. 1071 (S.D.N.Y.1979), the court held after a bench trial that defendants violated Sections 1114 and 1125(a) of the Lanham Act by offering for sale six counterfeit handbags. Plaintiff's private investigator instigated a conversation with defendant at defendant's store regarding the purchase of the counterfeit handbags. After the defendant offered six handbags at a set price deliverable immediately, the investigator left the store without purchasing any handbags. The court found on these facts that an offer had been made sufficient to find liability. *Id.* at 1075–76.

Here, Claiborne alleges that a taped telephone conversation between Claiborne's private investigator and Mademoiselle employee Stefansky shows that Mademoiselle offered to sell garments in violation of any authority. Stefansky did offer to "stick in" extra pieces into a Claiborne production run to sell to the investigator the authority granted. This was contradicted in a subsequent taped conversation, however, when he said they never intentionally did overruns. Stefansky Tr. at 94. However, he then said "[w]e never did that because we never had a reason to." Moreover, unlike Vuitton, the alleged "offer" did not refer to specific price, style, quantity, or delivery dates. Under the circumstances, the statements made by Stefansky to Claiborne's investigator are simply too ambiguous to say at this time that there is no genuine issue of material fact.

---

**12.** The court expressly states that it does not reach the issue for which it is cited by Mademoi-

selle. *Id.* at 622 n. 1.

Because summary judgment is denied on the grounds that there remains genuine issues of material fact, the possible merits of defendant's affirmative defenses of laches, acquiescence and unclean hands will not be considered.

### Conclusion

The motion of Claiborne for summary judgment is denied.

It is so ordered.