**TOO, INC., et al., Plaintiffs,**

v.

**THE TJX COMPANIES, INC., Defendant.**

**No. 2:01–CV–1243.**

United States District Court, S.D. Ohio, Eastern Division.

Aug. 15, 2002.

826

James B. Hadden, Porter Wright Morris & Arthur, Columbus, OH, Frank J. Colucci, Richard Jacobson, Kathleen M. McGann, Colucci & Umans, New York, NY, for Plaintiffs.

Maureen P. Taylor, Bricker & Eckler, Columbus, OH, Douglas H. Meal, Alexandra D. Furth, Ropes & Gray, Boston, MA, for Defendant.

Anthony Delligatti, Jr., Leon Friedberg, Carlile Patchen & Murphy, Columbus, OH, Christopher L. Lardiere, Kemp Schaeffer Rowe & Lardiere, Columbus, OH, Joseph Allen Butauski, David Arthur Caborn, Caborn & Butauski, Columbus, OH, for Third-Party Defendants.

## OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court for consideration of the Plaintiffs' Amended Motion for Preliminary Injunction.[1] (Doc. # 6). The Court heard testimony on the matter over a two day period. For the reasons that follow, the motion is granted

---

1. Plaintiffs withdrew their initial motion after filing an Amended Complaint.

as to Plaintiffs' claims for trademark infringement and unfair competition and denied as to Plaintiffs' claim for trademark counterfeiting.

## I.

Plaintiffs Limco, Inc. and Too, Inc. ["Plaintiffs"] bring this action seeking to enjoin Defendant TJX Companies, Inc. ["Defendant"] from offering or selling allegedly unauthorized and/or counterfeit LIMITED TOO merchandise. Plaintiffs assert claims of trademark infringement, counterfeiting and unfair competition in violation of 15 U.S.C. §§ 1114 and 1125. Plaintiffs' complaint also presents claims for commonlaw trademark infringement and unfair competition. The Court has jurisdiction pursuant to 28 U.S.C. § 1338 and § 1367.

Plaintiff Too, Inc. ["Too"], is a Delaware corporation with its principal place of business in Columbus, Ohio. Too operates over four hundred LIMITED TOO stores nationwide. The stores sell high-quality apparel designed and marketed for young girls aged seven to fourteen. Too also publishes a LIMITED TOO "catazine," *i.e.*, a catalogue/magazine, which is targeted to girls of the same age group and which offers for sale various types of clothing and personal care items bearing the LIMITED TOO mark. Too also operates a website which advertises, promotes and offers for sale various clothing, accessories and personal care items bearing the LIMITED TOO mark.

Plaintiff Limco, Inc. ["Limco"], is a Delaware corporation with its principal place of business in Wilmington, Delaware. Limco is the record owner of the LIMITED TOO marks, which are registered in the United States Patent and Trademark Office[2]. Too is the exclusive licensee of Limco.

Defendant TJX Companies, Inc. ["TJX"], is a Delaware corporation with its principal place of business in Framingham, Massachusetts. TJX is a retailer of off-price merchandise, including apparel. TJX operates the following stores: TJ Maxx, Marshalls, HomeGoods, and AJ Wright. There are approximately 1100–1200 TJX-owned stores nationwide.

From time to time, Plaintiffs sell their prior season merchandise to off-price retailers including the Defendant TJX. Too Executive Vice–President and Chief Financial Officer Kent Kleeburger testified about the procedure for prior season merchandise sell-offs. According to Kleeburger, although Too prefers to sell its prior season clothes on sale racks in LIMITED TOO stores, the company does engage in selling-off merchandise. The vast majority of sell-offs occur after Too authorizes the same orally or by e-mail. Kleeburger testified, however, that the policy for sell-offs is to obtain written authorization from Financial Group Vice President, Alan Newport. When merchandise is sold off, labels on the clothing items are not to be defaced.[3]

In the instant preliminary injunction motion, Too claims that TJ Maxx is offering 31 styles of LIMITED TOO garments for sale that are either unauthorized by Plaintiffs or are counterfeit.[4] When Plain-

---

**2.** The marks are:

LIMITED TOO (registration no. 1,492,347; issued on June 14, 1988); LIMITED TOO (registration no. 1,636,474; issued on February 26, 1991); LIMITED TOO (registration no. 1,726,609; issued on October 20, 1992); LIMITED TOO & Design (registration no. 2,243,565; issued on May 4, 1999);

and LIMITED TOO (registration no. 2,427,-419; issued on February 26, 2001). *Amended Complaint* at ¶ 11.

**3.** Labels on LIMITED TOO clothes appear at the back of the garments, either at the waist or neck.

**4.** As used in the parlance of trademark law and, as discussed *infra,* "unauthorized" goods

tiffs commenced this action in December 2001, they were aware of only five particular LIMITED TOO styles being offered for sale at the Easton TJ Maxx store in Columbus, Ohio at the same time the garments were being offered for sale in LIMITED TOO stores. Defendant then withdrew the garments from its selling floor. Thereafter, Plaintiffs learned that other allegedly unauthorized styles were either being offered for sale or were in the possession of Defendant. Consequently, Plaintiffs amended their motion for preliminary relief.

The Defendant contends that Plaintiffs are not entitled to preliminary injunctive relief because they cannot demonstrate that the various garments are not genuine LIMITED TOO manufactured items. Defendant further contends that Plaintiffs cannot show irreparable injury. The Court considers the merits of the parties' positions, *infra*.

## II.

The United States Court of Appeals for the Sixth Circuit has identified four factors to assist the Court in determining whether preliminary injunctive relief under Fed. R.Civ.P. 65 is appropriate. The analysis, which involves a weighing of the interests on both sides, requires consideration of the following: (1) whether there is a strong or substantial likelihood of the movant's success on the merits; (2) whether an injunction will save the movant from irreparable injury; (3) whether an injunction will harm others, including the non-movant; and (4) whether the public interest would be served by issuance of a preliminary injunction. *See e.g., International Longshoremen's Ass'n v. Norfolk Southern Corp.*, 927 F.2d 900, 903 (6th Cir.), *cert. denied,*

502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 38 (1991); *Sandison v. Michigan High School Athletic Assoc.*, 64 F.3d 1026, 1030 (6th Cir.1995).

These factors are meant to be balanced as they guide the Court in exercising its discretion; they are not due rigid application and need not be assigned equal weight. *In re Eagle–Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir.1992). While the Court need not consider any single factor as either indispensable or dispositive, neither is it required to conclude that all four support its decision. The Court's discretion is directed at the weight to be given each factor, and the effect to be accorded their mix. *Id.*

## III.

In this case, Plaintiffs claim that the Defendant's possession and sale of the garments at issue violates the Lanham Act because the garments were either unauthorized for production or because they are counterfeit. Plaintiffs also claim that the Defendant's sales of the garments amount to unfair competition in violation of the Lanham Act. In response, the Defendant asserts that Plaintiffs have failed to show a substantial likelihood that the garments were unauthorized. Defendant further asserts that a mark holder may not obtain relief under the Lanham Act for unauthorized sales of products made by an otherwise authorized manufacturer. In addition, the Defendant contends that the garments at issue are not counterfeit.

### Likelihood of Success on the Merits

An overview of this case reveals the following: the Plaintiffs contend and the Defendant does not dispute, that the Defendant has in its stores 653,010 items of current season clothing bearing the LIM-

---

are those which were produced by a manufacturer otherwise authorized by the holder to make trademarked products, but a quantity of such products were made without authoriza-

tion as to amounts or quality. An example would be an unauthorized sale of excess quantities by the manufacturer.

ITED TOO mark. Plaintiffs contend that no permission was given for use of the mark. Neither party has offered any evidence as to the identity of the manufacturer of the clothing. There are two possible sources of the clothing, the first being companies with whom the Plaintiffs have contracted to produce marked items of clothing. One or more of these companies could have produced items of clothing in excess of Plaintiffs' orders and sold the same in the marketplace. The second source could be companies which simply counterfeited the products by using reverse engineering. As shown below, the Plaintiffs' burden of proof varies considerably with regard to the two possibilities.

### A. Trademark Infringement

#### Unauthorized Production

 In order to succeed on their claim for trademark infringement under 15 U.S.C. § 1114, the Plaintiffs must demonstrate that the "[D]efendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir.1997). Section 1114 provides:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale ... or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant....

15 U.S.C. § 1114(1)(a).

To succeed in establishing liability under this section, the trademark registrant must show: (1) that it owns a valid, protectable trademark; (2) that the defendant used the mark in commerce and without the registrant's consent; and (3) there was a likelihood of consumer confusion. *See Microsoft Corp. v. Grey Computer*, 910 F.Supp. 1077, 1086–88 (D.Md.1995). The registrant of the mark need not prove intent in order to establish liability under this section. *Proctor & Gamble Co. v. Quality King Distributors, Inc.*, 123 F.Supp.2d 108, 112 (E.D.N.Y.2000). It is the likelihood of confusion that is the touchstone of a claim for trademark infringement under § 1114(1)(a). A "defendant's good intentions do not in any way preclude a finding of likely confusion ...." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1121 (6th Cir.1996) (citation omitted). Further, as discussed *infra*, the foregoing standard is the same applied on a claim for unfair competition under § 1125. *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642 (6th Cir.1982).

In this case, Plaintiffs argue that a likelihood of confusion exists because TJX is offering current season LIMITED TOO clothing that Plaintiff did not authorize for production. Defendant contends that if the items offered are in fact genuinely produced LIMITED TOO garments, *i.e.*, made by LIMITED TOO manufacturers, the garments do not fall within the protection of the Lanham Act.

Plaintiffs' apparel is manufactured primarily by four entities: Mast Industries, Li and Fung, Michelle of Hong Kong, and Smart Apparel. The entities are parties to a "Master Sourcing Agreement" which agreement details, *inter alia*, the authorization of production by Plaintiffs and the duty to verify country of origin for the garments produced.[5] Plaintiffs claim that

---

**5.** Defendant's sole witness, Christine Potter, testified, however, that the country of origin differs for identical garments sold in some of Plaintiffs' own stores. Potter is the Vice Pres-

many of the garments at issue in this case originate from countries different from those specified for production. Plaintiffs further claim that the number of garments in Defendant's possession for the various styles at issue exceeds the numbers that Plaintiffs authorized to be produced.

In support of their position, Plaintiffs rely on the testimony of Kent Kleeburger. Kleeburger compared the units of garments, by style, ordered by Plaintiffs and ultimately received[6] with the units held by Defendant TJ Maxx. Plaintiffs' Exhibits 68 and 70 outline the differences in numbers between the two categories.

The evidence demonstrates that, in many instances, Defendant TJX possesses a greater number of garments than Plaintiffs authorized for production. For example, with respect to style 1206, Plaintiffs ordered 11,389 units and received 11,779 units. Plaintiffs then sold 10,464 units and made 764 adjustments. Defendant, however, possessed 15,200 units of the same style garment. Exhibits 68 and 70 illustrate the same discrepancies with respect to styles 1231, 1242, 1262, 1371 and 2471.

Further, in many instances the number of units of garments possessed by Defendant far exceeds the number of units left in Plaintiffs' possession following sales in Plaintiffs' LIMITED TOO stores. This is true with respect to styles 1255, 1285, 1298, 1366, 1475, 1490, 1568, 1569, 1577, 1588, 1594, 1601, 1672, 1687, 2714, 6155. In addition, Kleeburger testified that there are at least two styles possessed by Defendant TJX which have no corresponding

LIMITED TOO style. These are TJ Maxx styles 2530 and 2614.

In addition to these numerical discrepancies, Kleeburger testified that there are discrepancies in the garments themselves which lead him to conclude that the items possessed by Defendant are either unauthorized or are counterfeit. For example, in many instances the country of origin differs between the items produced by Plaintiffs and those possessed by Defendant. Further, there are differences in fabric color as well as subtle detail differences on various garments.

In response to Plaintiffs' evidence on differences in country of origin and style detail, the Defendant relies on the testimony of Ms. Potter. Potter demonstrated that many of the current season garments, of identical style, which Plaintiffs sell in their own LIMITED TOO stores have varying countries of origin and subtle detail differences. Further, the Defendant elicited from Kleeburger, on cross-examination, that identical LIMITED TOO garments may be produced in different countries, thus resulting in different country of origin tags.

Nonetheless, Plaintiffs argue that the manufacturing documents obtained during discovery as to country of origin support their claim that the particular styles are either unauthorized or are counterfeit. In support of this position, Plaintiffs present a chart in their post-hearing brief outlining the distinction between countries of origin for Plaintiffs' garments and for Defendant's garments. Plaintiffs assert that from this evidence it is clear that certain styles were never authorized for production in the countries indicated on the TJX style tags.[7] The Defendant takes issue

---

ident of Product Development for Defendant TJX.

6. The number of units ultimately received is often times less than the number originally ordered due to cancelled orders, short shipments or sell-offs by Plaintiffs. (*See* Plaintiffs' Exhibit 68).

7. This argument is contained in section III.D.2 of Plaintiffs' Post–Hearing Brief, which contains the following chart:

with this argument and moves to strike the summary portion of the brief in which the argument is contained.

Defendant objects to the extent Plaintiffs' argument calls for an inference that the countries indicated on the chart are the *only* possible countries of origin for the garments at issue and therefore, are evidence that the garments are unauthorized or are counterfeit. Defendant also objects on the basis that Plaintiffs used the evidence improperly. In particular, Defendant claims that while it stipulated to the authenticity of the documents, it did not agree that these were the only documents in existence as to country of origin.

The Defendant's motion to strike is well-taken. The stipulation was limited and Plaintiffs' use of the documents in a way which Defendant did not anticipate and with the Defendant having no opportunity to present contrary evidence is prejudicial. Thus, the Court declines to consider the chart included in section III.D.2 of Plaintiffs' post-hearing brief.[8]

The Court finds that the country of origin evidence only slightly tends to show that the garments at issue were unauthorized. While Plaintiffs have pointed out some differences between the countries of origin for the Plaintiffs' and Defendant's garments, the Court finds this evidence to some extent refuted by the testimony of Ms. Potter and the cross-examination of Kleeburger. As Potter testified, and as Kleeburger conceded, several of LIMITED TOO's own identical style garments originate from different countries. The Court concludes, however, that the unrefuted evidence of discrepancies between the numbers of items ordered and held by Plaintiffs and those offered for sale by Defendant, shows that Plaintiffs are likely to succeed on their claim of trademark infringement based upon unauthorized production.

Defendant argues that, even if Plaintiffs show unauthorized production, Plaintiffs must also demonstrate that the excess garments held by Defendant were not authorized for sell-off. As Defendant points out,

| Style No. | Limited Too Country of Origin | TJX Country of Origin | Plaintiffs' Exhibit Reference |
|---|---|---|---|
| 71 | Russia; Korea | China | 36A, B; 90 |
| 1177 | Hong Kong | China | 62; 114 |
| 1206 | Hong Kong | China | 37A, B; 91 |
| 1231 | Hong Kong | China | 38A, B; 92 |
| 1242 | Hong Kong; Guatemala | China | 39A, B; 93 |
| 1255 | Hong Kong | China | 40A, B; 94 |
| 1262 | Taiwan | China | 41A, B; 95 |
| 1285 | China; Indonesia; Hong Kong | China | 42A, B; 96 |
| 1298 | Korea | China | 43A, B; 97 |
| 1366 | Hong Kong | China | 44A, B; 98 |
| 1490 | Hong Kong | China | 47A, B; 101 |
| 1568 | Hong Kong | China | 48A, B; 102 |
| 1569 | Hong Kong | China | 49A, B; 103 |
| 1601 | Sri Lanka; Korea Malaysia; Indonesia | China | 53A, B; 107 |
| 2471 | Hong Kong | China | 56A, B; 110 |
| 2714 | Korea | China | 57A, B; 111 |
| 6016 | Hong Kong | China | 58A, B; 112 |
| 6155 | Hong Kong; Mexico | China | 59A, B; 113 |

8. The Court will, however, consider evidence presented at the preliminary injunction hearing pertaining to style 1292. As Plaintiffs demonstrated, this garment was authorized for production in Hong Kong and Guatemala. Defendant's corresponding garment originated in China. (Plaintiff's Exhibits 93 and 39B).

while Plaintiffs have a policy that sell-off authorizations have to be in writing, the policy is not always followed. From this, Defendant urges the Court to infer that Defendant could have obtained the garments for sell-off.

The Court rejects this suggestion. The Court finds it illogical to infer that Plaintiffs would authorize items bearing the LIMITED TOO mark to be sold off when the evidence, at this juncture, demonstrates a substantial likelihood that Plaintiffs did not authorize the items to be produced. In addition, while Plaintiffs may not have followed the policy that sell-off authorizations had to be in writing, such evidence does not support an inference that Plaintiffs would have authorized the sell-off of large quantities of garments which Defendant likely obtained without Plaintiffs' authorization.

Alternatively, the Defendant also argues that, even if Plaintiffs have demonstrated unauthorized production, they cannot succeed because the holding in *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.,* 806 F.2d 392 (2nd Cir.1986) is not the law in this circuit. In that case, the Plaintiff El Greco Leather Products ["El Greco"] contracted with a Brazilian shoe factory, Solemio, to manufacture 25,000 pairs of shoes under the El Greco trademark, CANDIE'S. During the manufacturing process, El Greco became dissatisfied with the quality of work as well as with Solemio's delay in performing. As a result, El Greco cancelled part of its manufacturing order. Solemio, however, continued to manufacture the remainder of the order and sold approximately 7000 pairs of shoes to Defendant Shoe World, Inc. Defendant Shoe World then began selling the shoes at a discount price, while the shoes were concurrently being offered for sale by El Greco at full price. Upon Shoe World's refusal to stop selling the shoes, El Greco

commenced suit for trademark infringement and unfair competition under 15 U.S.C. §§ 1114 and 1125(a).

The district court dismissed Plaintiff El Greco's request for a permanent injunction holding that because the shoes were genuine, the sale, although unauthorized, could not constitute a violation of § 1114 or § 1125(a). The district court further concluded that, because the shoes were genuine, there was no likelihood of confusion to the buying public.

The issue on appeal was the meaning of "genuine" for purposes of the Lanham Act. The Second Circuit concluded that the shoes sold by Defendant Shoe World could not be considered genuine. The court stated:

> One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark. For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain.

*Id.* at 395 (internal citations omitted). The court reasoned that, because El Greco required that no merchandise could be distributed by Solemio without El Greco's prior inspection, El Greco's interest in quality control was usurped by Solemio's actions. Thus, the 7000 pairs of shoes distributed to Shoe World could not be considered genuine for purposes of the Lanham Act.

Defendant cites two cases from this district in support of its position that *El Greco* is not followed in the Sixth Circuit [9]: *Shonac Corp. v. AMKO, Int'l, Inc.,* 763 F.Supp. 919 (S.D.Ohio 1991) (Graham, J.) and *Advanced Sports Concepts, Inc. v. Baden Sports, Inc.,* No. 93–100, 1993 WL

9. The Sixth Circuit has not had occasion to consider the *El Greco* holding.

592529 (S.D. Ohio June 7, 1993) (Graham, J.).

In *Shonac Corp.*, the Plaintiff discount shoe retailer sued the Defendant shoe purchasing agent. The Defendant purchased shoes in Korea for Plaintiff to sell in the United States. The shoes were obtained, however, without authorization from the various trademark holders. The court held that because the Plaintiff "has no interest whatsoever in the trademarks that are the subject matter of this case, it lacks standing to sue under § 43(a)[10]." *Shonac Corp.*, 763 F.Supp. at 931. Although this holding was dispositive of the issue, the court went on to consider an argument briefed by the parties; that is, whether the unauthorized sale of genuine goods can constitute a trademark violation. The court cited the *El Greco* decision but concluded that it was inapplicable because Plaintiff "is not a trademark holder and thus does not have the interest a trademark owner would have in protecting its name by reserving the right to inspect the goods." *Id.* at 937. Defendant's reliance on this case is misplaced. Here, Plaintiffs are the trademark holders and, unlike Plaintiff in *Shonac*, have an interest in protecting their marks.

Later, in *Advanced Sports Concepts, supra,* the court was again confronted with the El Greco holding, although in a different factual context. Plaintiff in that case sued Defendant Baden Sports for trademark infringement and unfair competition after Defendant sold certain oversized basketballs bearing Plaintiffs' trademark. The sales occurred after Plaintiff canceled its manufacturing contract with Defendant. On the claim of trademark infringement, the court held that "[i]t is correct that 'trademark law generally does not reach the sale of *genuine* goods bearing a true mark even though such sale was without the owner's consent.'" *Advanced Sports Concepts,* 1993 WL 592529 at *2 (citations omitted) (emphasis in original). The court cited *El Greco, supra,* in connection with the Plaintiff's argument that if a product does not meet the quality control standards of the mark holder, then the goods cannot be considered genuine. *Id.* The court concluded, however, that because there was no evidence that any of the basketballs sold failed to conform with the Plaintiff's manufacturing contract specifications, the El Greco holding did not apply and the basketballs sold were genuine.[11]

While this Court fully agrees with the conclusions reached by Judge Graham in *Advanced Sports Concepts,* the case at bar is distinguishable. In *Advanced Sports Concepts,* the basketballs were made by

10. The Court notes that Plaintiff's claim in that case was under the pre–1988 amendment of § 43(a) of the Lanham Act.

11. The Court notes that the *El Greco* rule was recently applied in *Ford Motor Company v. Lloyd Design Corp.,* 184 F.Supp.2d 665 (E.D.Mich.2002), where the Plaintiff automobile manufacturer sued the Defendant manufacturer of automobile floor mats. Defendant produced mats bearing Plaintiffs' trademarks for various automobiles despite the fact that Plaintiffs manufactured their own floor mats and the Defendant was not a licensed manufacturer for Plaintiffs. The Defendant argued, *inter alia,* that the mats made were a high quality. The court held that, nevertheless, the

Defendant's actions deprived Plaintiffs of the right to control the quality of goods on which its marks were placed. "[A] finding that the aesthetic functionality of Plaintiffs' trademarks precludes Defendant from being held liable for trademark infringement could result in other manufacturers marketing poorer quality mats with Plaintiffs' trademarks.... As a result, members of the general public could be misled ...." *Id.* at 677.

In light of this decision, Defendant is incorrect to assert that the *El Greco* rule is not applied in this circuit. The decision in *Ford Motor Co.* is, however, not necessarily controlling of the case at bar because Plaintiff herein is not suing the manufacturer of the garments.

the Defendant, which then sold them after the manufacturing contract was terminated. Further, under at least one of the parties' manufacturing agreements, the Defendant was authorized to sell basketballs in the event that the Plaintiff trademark holder terminated the contract. These facts support the court's holding that the goods were genuine and could not be subject to a claim of trademark infringement. Moreover, the essence of the dispute concerned a contractual claim between the manufacturer and the seller which owned the mark.

The situation at bar is distinguishable. First, it is unclear who manufactured the garments that are the subject of this case. In addition, Plaintiffs have come forward with unrefuted evidence to demonstrate a substantial likelihood that the garments were made without Plaintiffs' authorization. In *Advanced Sports Concepts,* the basketballs were made at the Plaintiff's direction while the parties disagreed as to whether the manufacturer could sell them in the event the contract was terminated. In this case, no authorized manufacturer has a dispute with Plaintiff relative to the claims at bar.

The Court finds the decision in *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.,* 979 F.Supp. 224 (S.D.N.Y.1997), instructive. In *Liz Claiborne,* the Plaintiff trademark owner sued a contractor alleging that the Defendant sold irregular and overrun garments bearing the Plaintiff's mark without permission. The Defendant, which did not produce the garments, argued that the garments it obtained for sale were genuine and could not be subject to the Lanham Act. The Court observed that while "the sale of genuine goods without authorization by the trademark holder generally will not constitute trademark infringement ' ... [s]uch cases ... usually arise when the initial sale of the trademarked goods was authorized, and the sec-

ond or subsequent sale is contested." *Id.* at 230. This is referred to as the "exhaustion doctrine," under which a markholder may no longer control branded goods after releasing them into the stream of commerce. If the first sale is exhausted, then "[d]own the line retailers are free to display and advertise the branded goods." *Id.,* quoting *Osawa & Co. v. B & H Photo,* 589 F.Supp. 1163, 1173 (S.D.N.Y.1984). As the *Liz Claiborne* court observed, the exhaustion doctrine presupposes that the goods were authorized to be made, in the first instance. *Id.*

The Defendant in this case is analogous to the Defendant in *Liz Claiborne.* Both Defendants are down-the-line retailers selling garments bearing purportedly genuine marks. The Plaintiff herein has, however, come forward with evidence showing a substantial likelihood that the garments were not authorized for production in the first place. Thus, as the *Liz Claiborne* court observed, there is a likelihood that the garments cannot be considered genuine for purposes of the Lanham Act. Further, while the Defendant claims that it merely sold overrun garments made with Plaintiff's authorization, the Defendant has presented no evidence to support this assertion. Thus, the Court finds that the Plaintiffs are likely to prevail on their claims.

■ The Court further concludes that the other factors traditionally applied by the Sixth Circuit in assessing a trademark infringement claim, weigh in Plaintiffs' favor. The factors are:

(1) the strength of the plaintiff's mark, (2) the relatedness of the goods or services offered by the plaintiff and the defendant, (3) the similarity of the marks, (4) any evidence of actual confusion, (5) the marketing channels used by the parties, (6) the probable degree of purchaser care and sophistication, (7)

the defendant's intent in selecting its mark, and (8) the likelihood of either party expanding its product line using the marks.

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir.1997), citing *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir.1982).

The Sixth Circuit holds that the foregoing factors are not necessarily applicable to every case. The "ultimate question [is] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir.1991). The Court will, however, consider each of the factors.

### 1. Strength of the Plaintiff's Mark

This factor focuses on the distinctiveness of a mark and its recognition among the public. "The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 280 (citation omitted). The strength of a mark is generally attributable to its unique nature, its owner's intensive advertising efforts, or both. *Id.*

In this case, the evidence demonstrates the distinctive character of the LIMITED TOO mark. The mark is associated with high-quality goods targeted to girls of a specific age. Clearly, the general public anticipates that items bearing the LIMITED TOO mark will reflect Plaintiffs' high standards. Unauthorized use of the mark clearly disadvantages Plaintiffs. Thus, given the fact that the LIMITED TOO mark is distinct, it is owed protection.

### 2. Relatedness of the Goods or Services

The issue of relatedness focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers will likely lead the customers to believe that the goods "came from the same source, or are somehow connected with or sponsored by a common company." *Homeowners Group*, 931 F.2d at 1109.

This factor also weighs in Plaintiffs' favor. The competing goods at issue in this case are indeed related to those offered for sale by Plaintiffs. Moreover, since Plaintiffs sell-off their goods from time to time to retailers including the Defendant, it is likely that consumers would expect the goods to have come from the Plaintiffs' manufacture.

### 3. Similarity of the Marks

The inquiry under this factor is whether a particular trademark, when viewed alone, would lead to uncertainty about the goods or services it identifies. *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 283.

In this case the marks are indeed similar, if not identical, because both use the name LIMITED TOO. Thus, clearly there is a possibility that Defendant's use of the mark would confuse consumers.

### 4. Evidence of Actual Confusion

This factor is "undoubtedly the best evidence of likelihood of confusion." *Id.* at 284. Nonetheless, "[d]ue to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant . . . ." *Id.*

In the case at bar, no evidence of actual consumer confusion was presented. As the Sixth Circuit has held, however, this fact is not detrimental to Plaintiffs' claim.

#### 5. Marketing Channels Used

This factor "consists of considerations of how and to whom the respective goods or services of the parties are sold." *Homeowners Group*, 931 F.2d at 1109. If the predominant customers of the Plaintiff and Defendant are dissimilar, the possibility of confusion is less likely. *Id.*

In this case, the customer base is nearly identical—girls of a certain age group who either pay full price for the LIMITED TOO garments or, those who decide to purchase the same garments off-season at a lower price. The possibility of confusion is indeed present given the marking channels used by the parties.

#### 6. Likely Degree of Purchaser Care

The degree of care which consumers use in purchasing the goods or services at issue may affect the likelihood of confusion. In general, the standard to consider is the typical buyer using ordinary caution. *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 285. A higher standard is used when a buyer has expertise or is otherwise more sophisticated with respect to the purchase at issue or, if the goods or services are expensive or unusual. *Id.* Under the latter scenarios, there is less potential for a likelihood of confusion. *Id.*, citing *Homeowners Group*, 931 F.2d at 1111. Nonetheless, "[t]he ultimate significance of a given degree of care ... often will depend upon its relationship with the other seven factors." *Id.* at 285.

In this case, the Court applies the standard for the ordinary consumer. The goods at issue in this case are not particularly expensive or unusual to justify application of a higher standard of consumer care. Rather, the consumers in this case are young girls and their parents who recognize the distinctiveness of the LIMITED TOO mark for girls of a certain age. This ordinary group would likely be con-

fused by the Defendant's use of the mark in an unauthorized manner.

#### 7. Intent of the Defendant

Evidence that the Defendant intentionally copied the Plaintiff's mark can constitute strong evidence of consumer confusion. *Homeowners Group*, 931 F.2d at 1111. Lack of intent, however, neither reduces nor increases the probability of confusion. *Daddy's Junky Music Stores, Inc.* 109 F.3d at 286.

In this case, there is no evidence to demonstrate the Defendant actually intended to copy Plaintiffs' mark; however, the fact that Defendant obtained large quantities of garments produced without Plaintiffs' authorization demonstrates a high probability of consumer confusion.

#### 8. Expansion of Product Line

Under the final factor, "a 'strong possibility' that either party will expand his [or her] business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners Group*, 931 F.2d at 1112, citing Restatement of Torts § 731(b) and comment c (1938). The absence of such evidence does not, however, increase or reduce the likelihood of confusion. *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 286.

In this case, there is no evidence to show that either party would expand its product line to compete with each other in the same market. Plaintiffs do not themselves engage in sell-offs, nor does Defendant target its goods exclusively to girls of a certain age group. Thus, the absence of expansion by either party of the product lines does not increase or reduce the chances for consumer confusion that already exist by Defendant's use of the mark.

In sum, the Court concludes that application of the foregoing factors demonstrates that Plaintiffs have a substantial likelihood of success on their claim of trademark infringement based upon unauthorized production.

**Trademark Counterfeiting**

■ Plaintiffs also assert a claim for trademark counterfeiting, under 15 U.S.C. § 1114, which prohibits the use of "any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale ... of any goods ... [where] such use is likely to cause confusion ... or to deceive." 15 U.S.C. § 1114(1)(a). The Lanham Act provides the potential for an award of treble damages upon a successful showing of trademark counterfeiting. 15 U.S.C. § 1117.[12]

To state a claim for trademark counterfeiting, the Plaintiff must allege that (1) the Defendant infringed a registered trademark in violation of § 1114 and (2) the Defendant intentionally used the mark knowing it was a counterfeit, as the term counterfeit is defined in 15 U.S.C. § 1116.[13] *See Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1180 (11th Cir.1994).

Trademark counterfeiting is "the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark." *Louis Vuitton Malletier v. Veit*, 211 F.Supp.2d 567, 581 (E.D.Pa.2002) (citation omitted).

Plaintiffs' claim for trademark counterfeiting is distinct from their claim for trademark infringement and involves a higher burden of proof. In order to succeed on this claim, Plaintiffs must show trademark infringement as well as the intentional use of a counterfeit mark. As discussed above, this Court concludes that Plaintiffs are substantially likely to succeed on their claim that Defendant infringed Plaintiff's trademarks by selling garments not authorized for production. Thus, the first element of Plaintiffs' claim for trademark counterfeiting is likely satisfied.

The Court cannot conclude, at this juncture, that Plaintiffs have satisfied the second element of their claim. While the evidence adduced demonstrates a likelihood that the garments may be counterfeit, as that term is defined in §§ 1116 and

12. In particular, the statute provides:

In assessing damages ... the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 1114(1)(a) of this title ... that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services ....
15 U.S.C. § 1117(b).

13. Section 1116 provides, in relevant part:

(i) a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale,

or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered; or (ii) a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of this chapter are made available by reason of section 380 of Title 36;

but such term does not include any mark or designation used on or in connection with goods or services of which the manufacture[r] or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.
15 U.S.C. § 1116(d)(1)(B).
In turn, 15 U.S.C. § 1127 defines "counterfeit" as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark."

1127, the evidence presented to date does not support a finding that the Defendant used these marks *knowing* they were counterfeit. Thus, to the extent Plaintiffs seek injunctive relief under this theory, the motion is denied.

### B. Unfair Competition

■ In addition to their claims under § 1114, Plaintiffs bring a claim for unfair competition in violation of 15 U.S.C. § 1125, which provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

Likelihood of confusion is the touchstone for a claim of unfair competition. *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1123 (6th Cir.1996). The factors considered in assessing a claim under § 1125 are the same as employed under § 1114 in assessing a claim for trademark infringement. *Id.*

Since Plaintiffs herein have demonstrated satisfaction of the factors on their claim for trademark infringement, it follows that Plaintiffs have also satisfied the test for a claim of unfair competition. Consequently, this Court concludes that Plaintiffs have a substantial likelihood of success on this claim so as to warrant preliminary injunctive relief.

### Irreparable Injury

■ The Court next considers whether Plaintiffs will suffer irreparable injury in the absence of preliminary injunctive relief on their claims under §§ 1114 and 1125.

Defendant argues that because many of the styles in Defendant's possession are not current season styles simultaneously being offered for sale in LIMITED TOO stores, Plaintiffs will not suffer irreparable harm. Plaintiffs argue that despite the fact that the styles are not current, irreparable injury is presumed as a result of a finding of a likelihood of confusion for purposes of the Lanham Act.

Plaintiffs' position is correct. The law in the Sixth Circuit is that "no particular finding of likelihood of . . . irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases." *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir.1999), citing *Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir.1991). Therefore, because the Court finds a likelihood of success on Plaintiffs' claims for trademark infringement and unfair competition, it follows that Plaintiffs are entitled to preliminary injunctive relief.

### Harm to Others

■ The Court concludes that the issuance of preliminary injunctive relief would not result in harm to third parties. Rather, the issuance of relief would likely prevent third parties, including consumers of LIMITED TOO products, from being confused by Defendant's unauthorized use of Plaintiffs' mark. Thus, the Court finds no obstacle to relief on this basis.

*Public Interest*

Finally, the Court concludes that the public interest would be served by the issuance of injunctive relief in this case. As stated above, the Court finds that Plaintiffs have a substantial likelihood of success on their claims. Clearly, the public, including consumers, will be well served by eliminating the confusion associated with Defendant's unauthorized use of the LIMITED TOO mark.

## IV.

As a final matter, the Court addresses the Defendant's objection to the admission of evidence regarding "style 1687." Both parties acknowledge that this style was not part of the original or amended complaint in this case. Plaintiffs did, however, designate style "687" as an allegedly infringing style in the amended complaint and motion. The style was so designated based upon Defendant's identifications in response to discovery requests. Shortly before the close of discovery, Plaintiffs learned that style 687 should in fact be style 1687. Defendant claims that it is prejudiced by the introduction of evidence on this style because the style was not part of the pleadings and Defendant was not made aware of the correct numerical designation until shortly before the preliminary injunction hearing commenced.

Defendant's objection is overruled. The Court concludes that Defendant was in no way prejudiced by the introduction of evidence pertaining to style 1687. In fact, Defendant provided the garment style, although numerically mis-designated, to Plaintiffs for inspection at its Massachusetts warehouse in January 2002. Thus, Defendant's argument that it was deprived of the ability to conduct discovery on style 1687 is without merit.

The Court notes that Plaintiffs have filed a motion to strike the Defendant's memorandum regarding style 1687, as well as the accompanying exhibits A,B,C and D, which were not introduced as evidence during the hearing. Plaintiffs' motion as it pertains to the exhibits only, is well-taken.

## V.

In light of the foregoing, Plaintiffs' Amended Motion for Preliminary Injunction (**Doc. # 6**) is **GRANTED in part and DENIED in part**. Plaintiffs' Motion to Strike (**Doc. # 56**) is **GRANTED in part and DENIED in part;** Defendant's Motion to Strike (**Doc. # 58**) is **GRANTED.**

**IT IS SO ORDERED.**